ESTELLA J. FREED, JOINED BY HER HUSBAND, CHARLES J. FREED, *Appellants,* v. MIAMI BEACH PIER CORPORATION, A FLORIDA CORPORATION, *Appellee.*

## Division B.

## Opinion Filed April 15, 1927.

1. Upon the admission of the State of Florida "into the Union on equal footing with the original States in all respects whatsoever," under the Act of Congress, approved March 3, 1845, the lands within the territorial limits of the State below ordinary high water marks of the Ocean and Gulf and other navigable waters, became the property of the State by virtue of its sovereignty. Such lands are held, not for ordinary purposes of proprietary dominion, but for lawful and appropriate public purposes for the benefit of the people of the State, subject to the power of Congress under the Federal Constitution to regulate navigation and commerce.

2. In addition to the rights accorded by the common law under the doctrine of accretion, alluvion and reliction (in so far as the doctrine is consistent with the laws of the State), riparian or littoral proprietors who own to ordinary high water mark of the Ocean or Gulf or other navigable waters, have common law rights in the adjacent waters such as access to the waters with the right to bathe, fish and navigate in the waters subject to lawful regulation by the sovereign State in the interest of the public and subject to the authority of Congress as to commerce and navigation.

3. Riparian or littoral owners to ordinary high water mark on the Ocean or Gulf or other navigable waters have by the common law a qualified right with the consent or acquiescence of the State to erect wharves or piers or docks in front of the riparian holdings to facilitate access to and the use of the navigable waters, subject to lawful State regulation and to the dominant powers of Congress.

4. If wharves or piers or docks are erected in navigable waters without due authority, they may be removed as purprestures; or if they are or become a nuisance or are harmful to the rights of the public, they may be removed or abated by due course of law.

5. Where under proper authority structures or objects are put upon lands below high water mark of the Ocean or Gulf or other navigable waters, the rights of adjoining riparian owners and other persons as well as the rights of the public must be observed in exercising the duly acquired privilege to so use the land below high water mark; and any substantial encroachment upon the rights of others may be remedied by timely and appropriate procedure in due course of law at the instance of proper parties; but the rights of individuals to remedy may be waived by undue delay or laches in seeking a remedy.

6. The shore line and the channel or line of general navigability may not run in the same direction so as to make the lines practically parallel; and the boundary lines of lands that extend to the shore line may not run at right angles with the shore line or with the channel of the navigable waters. These conditions present questions as to the rights of riparian or littoral owners that require the ascertainment and application of appropriate rules to particular facts in each case as it is presented and developed for adjudication.

7. Riparian rights do not necessarily extend into the waters according to land boundary lines; nor do such rights, under all conditions, extend at right angles with the shore line.

8. The erection of a pier by a riparian lot owner upon submerged lands of the State not at right angle with the shore line of the lots, will not be enjoined at the suit of an adjoining lot owner when the pier does not materially obstruct or impede access to the adjoining riparian lot, though the pier does obstruct distinct view, where complainant did not promptly act while large expenditures were being made in the construction of the pier under governmental authority.

An Appeal from the Circuit Court for Dade County; W. H. Price, Judge.

Affirmed.

*T. E. Price* and *Harold Kassewitz,* for Appellants;

*Shipp, Evans & Kline,* for Appellee.

WHITFIELD, P. J.—The bill of complaint herein filed May 6, 1926, in the lower Court by appellants here, alleges in effect that complainants are the owners of Lot 6 of Block 112 of Ocean Beach, Addition No. Four, in Dade County, Florida; that the defendant corporation claims a leasehold interest in Lots 7 and 8, Block 112 of Ocean Beach, Addition No. Four; that defendant on or about the first day of February, 1926, did "begin the erection of an ocean pier on the land lying between high and low water mark adjoining lots seven and eight of Ocean Beach, Florida, Addition No. Four, and on the submerged lands lying in front of Lots seven and eight of Ocean Beach, Florida, Addition No. Four, and in front and at a line on right angles with the shore line of Lot six of Block one hundred twelve of Ocean Beach, Florida, Addition No. Four. That, as part of said structure, the said respondent has, through its agents and servants, caused the construction of numerous concrete piles or pilasters, the same being approximately three feet in diameter and extending eight feet above the tide-water at high tide; that said structure is being erected in a northeasterly direction and is, at the present time, approximately forty-five feet beyond a line drawn at right angles to the shore line of Lot six of Block one hundred twelve where the south upland boundary line intersects said shore line; that

the erections of said pilings into the said submerged lands lying between lines drawn at right angles to the shore line of Lot six of Block one hundred twelve where the upland boundary line intersects said shore line is an encroachment upon the submerged lands of your orators. Your orators are informed and believe that the respondent intends to continue to encroach upon the said submerged lands of your orators, and by using for itself, and to the exclusion of your orators the said pilings and pier, and that the said erection of said pilings driven into your orators' said submerged lands and the said erection of the said pier, will constitute encroachments upon submerged lands of your orators lying in front of Lot six of Block one hundred twelve of Ocean Beach, Florida, Addition No. Four;'' that the defendant obtained from the City of Miami Beach the following:

"BE IT RESOLVED BY THE CITY COUNCIL OF THE
    CITY OF MIAMI BEACH, FLORIDA:

"That said City hereby finds that it has no objections to the construction of a pier by George R. K. Carter, extending eastwardly from Lots 8 and 7 in Block 112 of Ocean Beach, Florida, according to a plat recorded in Plat Book 3 at page 151 of the Public Records of Dade County, Florida, straight east parallel with the north line of Biscayne Avenue, projecting straight into the Atlantic Ocean, and hereby signifies its intention to make no objections before the War Department of the United States to such construction, providing the same is made in accordance with the proposed plans and perspective this day submitted to this Council.

PASSED AND ADOPTED this 14th day of October, A. D. 1925:''

That the defendant "did on or about the 27th day of November, A. D. 1925, apply to the War Depatrment of the United States of America for permission to erect said ocean pier, and did on or about the said day and year re-

ceive a waiver of objections or permit from the War Department of the United States of America according to the statutes of the United States of America in such cases made and provided;'' that complainants ''have caused to be erected upon their said property a Casino and Dance Pavilion and that they are engaged in the operation of the same as such; that the principal value of said property is caused by reason of its accessibility to the ocean; that the erection of said pilings and pier will tend to greatly impair and depreciate the value of said property.''

The prayer is for ''an interlocutory decree restraining and enjoining the respondent, Miami Beach Pier Corporation, its officers and servants, employees, agents and all persons acting or cliaming to act by, through or under said respondent, from erecting further pilings upon the submerged lands of your orators, or from leaving the said pilings already erected in front of the lands of your orators upon said submerged lands or from using the said pilings while the same are erected upon the submerged lands lying in front of the submerged lands of your orators and from in any way encroaching upon said submerged lands of your orators; that in a final hearing injunction may be made perpetual; that a decree be entered requiring the respondent to compensate your orators for any damage done them by the erection of said pilings and for such other and further damages as may come upon your orators by reason of said encroachment; that your orators may have such other and further or other or further relief as may be agreeable to equity and good conscience.''

The defendant filed a demurrer and answer. In the answer ''defendant admits that it is erecting a pier in front of lots 7 and 8, Block 112, Ocean Beach, Florida, Addition No. 4; that it has caused the construction of concrete piles approximately 3 ft. in diameter, and extending over 8 ft.

above the surface of the water, but denies that said pier is being erected in a northeasterly direction; denies that it is approximately 45 ft. beyond a line drawn at right angles with the shore line of Lot 6, Block 112; denies that it has intruded upon the property of complainant, or encroached upon its lines, but says that said pier is being erected over the submerged lands in front of lots 7 and 8, and in the direction of defendant's lines continuing to the channel, and denies that it has encroached upon defendant's lines or lands or property, and denies that it will encroach upon same.''

Testimony was taken before the Chancellor, who at the final hearing dismissed the bill of complaint, stating in an opinion contained in the record that ''The Court, under the testimony in this case, is of the opinion that the dedicators of Biscayne Avenue, and the gentleman who made the plot and subdivided the lands intended that all the lots in Block 112, with the exception of lot 8, should be as near as possible to the then existing high-water mark, and that it was the object in the location of this block, as well as the blocks above and below—that is, north and south—to give each lot owner as near as could possibly be done, the same water frontage, with the exception of lot 8, and lot 8 seems to be laid off with the view of making the block correspond with Biscayne Avenue, as shown on the map or plot of 1914.

''The evidence in this case shows that since the building of the jetties there has been considerable accretions to the lands in question. In other words, that the high-water mark has been extended further out towards the ocean, practically in the neighborhood of 100 feet. I am of the opinion that the (riparian) Act of 1921 is not operative insofar as lands are situated upon the Atlantic Ocean, and that the rights of persons owning property facing the

water would be that so far as the water itself is concerned, that of a common law riparian owner.

"I am further of the view that the accretions which have been accumulating in front of the respective lots in controversy in this case are owned by the upland owners to the high-water mark along the lines of their respective lots extending to that mark.

"Under the laws of the State of Florida, as I conceive them to be, the riparian rights of upland owners extend, not according to the lot lines, but at right angles to the high-water mark, or as near as the same practically can be done, towards the channel. In the Atlantic Ocean I think it is impossible to determine exactly, or within a degree of certainty, the borders of the edge of the channel, only to the effect that it extends in a general way north and south.

"I am of the opinion that the pier under consideration does not extend at right angles to the high-water mark at the shores, but is on angle of approximately 12 or 13 degrees from such right angle, while it is practically at the exact spot where it is built at right angles to the low-water mark. In other words, from a cursory examination of the shore line, as also from the testimony in this case, approximately at the place where this pier is erected or started from, or commenced, as I might say, there seems to be a slight curve as to the shore line, meaning thereby, the low-water mark from the general trend of the high-water mark in front of the lots in question. The property line of the owners of lots 2 to 6 inclusive seems to be practically in a straight line, but not extending exactly north and south. I do not think that a light curve or slight curve, bending in and out, so as to make it slightly a meandering line, would be effective to change the general rule as to the riparian owner's rights to the water line in front of his property. In other words, I think the general trend or direction of the high-water

mark would be the controlling matter to be considered, as to the course or direction of the lines of the apparent owner extending out in the ocean in the direction of the channel, and that small curvatures on the shore line would not be taken into consideration.

"From the photographs taken of the shore line from the airplane, it is apparent that the general trend of the high-water mark down to and including the low-water mark is that almost of a straight line, and that the pier in question does not extend at right angles to that shore line. If there were no testimony other than this there would be no question in my mind as to the right of the complainants for a restraining order, but the evidence in this case shows that in October of 1924, Mr. Carter, or the persons acting for the present pier company, made application to the City of Miami Beach, through its proper officers, for a permit to locate a pier; that at the time of making the application, and in the permit granted, while the city had no authority to control the direction of the pier, it was stipulated that the same should run parallel to Biscayne Avenue. This, in my opinion, would give notice to the complainants in each of these cases of the intention of the pier owners to locate the pier in question, not at right angles to the high-water mark, but parallel to Biscayne Avenue.

"In November, 1924, there was a map or plot made of this pier, with soundings as to water, to its extremity, and which map or plot showed the location of the pier as it is now situate. That map or plot evidently was public property, and all parties concerned were advised of the purpose of the respondents as to the location of the premises in question. There was no attempt made on the part of complainants after the application was granted by the City Council, and after the making of this survey, to secure information as to the location of the present pier, the depth of water,

and such other data as was necessary upon which to make a calculation as to the plans of this building and its location.

"The evidence does show that the Pier Company at one time applied to Mr. Freed for a waiver, which was not granted by Mr. Freed, but it does not show that Freed took any active steps to prevent the erection of the pier in question until about May 5th of this year. If this matter had been presented to me before any work was done upon this pier, or before large sums of money had been expended thereon, I would not have hesitated one moment in granting a restraining order.

"The evidence does not show that there was any communication prior to April 14, as between the Casino Amusement Company and the defendant Pier Company, with reference to the construction of this pier. The evidence affirmatively shows, which is not denied, as I recollect it, only by argument of counsel, that before the commencement of the actual caissons, and the pier work—I do not know what you would call it—stones or cement work, that a survey was made, stakes were set up which would show their direction and the location of the pier in question.

"My view is that it was the duty of the complainants if they made any objection to this pier, to have done so before the work was commenced or any large sums of money were expended on the construction of the pier in question. The evidence shows that the first real objection which was served upon the authorities was in a letter of about April 27th, while before that time there was a consultation between counsel and members of the Pier Corporation, which I believe date about April 14th, but no active steps were taken to stop the work. On April 14, according to the testimony $93,000 had been expended by the Pier Company in the prosecution of this work in what they conceived to

be their legal rights under a permit from the War Depart-
ment, as also under a permit from Miami Beach. By the
time of the filing of the respective bills this sum has in-
creased to approximately $140,000, as I recollect, and at
the time of the hearing of this case, that the amount actually
expended on that pier, under the belief of right, while it
may have been erroneous, but upon legal advice and upon
their construction of the law, amounts to something like
$240,000.

"There appears to be a large number of shares sold to
various and sundry persons, and the evidence shows in this
case that if any injunction should be granted, as it is now
upon final hearing where no bond could be required, that
the assets of this corporation would be virtually wiped out,
and that the injury suffered would amount to something
approximately like a quarter of a million dollars. While
the complainants in this case have suffered injury, yet there
is authority which would not authorize the maintaining of
this suit.

"To grant an injunction at this time, I think, would be
a great calamity. My opinion is that the rights of the
complainants are so disproportionate to the injuries which
the defendants would suffer that a court would not be
authorized to grant the prayer of the respective bills, and
that to do so would be a calamity, not only to the owners
of the property, but the citizens of Miami Beach and Miami
proper. I think that the complainants have not clearly
shown any great injury suffered; in fact, the view of the
court is, after a careful personal inspection of the entire
property, that if this building should be completed along
the lines as shown by the plans and specifications, with a
boardwalk along the front, that no greater benefit could
happen to the City of Miami, Miami Beach and to the prop-

erty owners in Block 112." An appeal was taken by the complainants.

The State of Florida is bounded on the east by the Atlantic Ocean and on the south by the Gulf of Mexico. Upon the admission of the State of Florida "into the Union on equal footing with the original States in all respects whatsoever," under the Act of Congress approved March 3, 1845, the lands within the territorial limits of the State below ordinary high water marks of the Ocean and Gulf and other navigable waters, became the property of the State by virtue of its sovereignty. See the Abby Dodge, 223 U. S. 166. Such lands are held, not for ordinary purposes of proprietary dominion, but for lawful and appropriate public purposes for the benefit of the people of the State subject to the power of Congress under the Federal Constitution to regulate navigation and commerce.

In addition to the rights accorded by the common law under the doctrine of accretion, alluvion and reliction (in so far as the doctrine is consistent with the laws of the State), riparian or littoral proprietors who own to ordinary high water mark of the Ocean or Gulf or other navigable waters, have common law rights in the adjacent waters such as access to the waters with the right to bathe, fish and navigate in the waters subject to lawful regulation by the sovereign State in the interest of the public and subject to the authority of Congress as to commerce and navigation. Ferry Pass Inspectors' & Shippers' Ass'n v. Whites River Inspectors' & Shippers' Ass'n., 57 Fla. 399, 48 South. Rep. 643. Riparian or littoral owners to ordinary high water mark on the Ocean or Gulf or other navigable waters have by the common law a qualified right with the consent or acquiescence of the State (Thiesen v. Gulf, F. & A. R. Co., 75 Fla. 28, 78 South. Rep. 491) to errect wharves or piers or docks in front of the riparian holdings to facilitate access to and the use of the navigable waters, subject to

lawful State regulation and to the dominant powers of Congress. Cummings v. Chicago, 188 U. S. 410, 23 Sup. Ct. Rep. 472. If such wharves or piers or docks are erected without due authority, they may be removed as purprestures; or if they are or become nuisances or are harmful to the rights of the public, they may be removed or abated by due course of law. Trustees of Freeholders & Commonalty of Town of Brookhaven v. Smith, 188 N. Y. 74, 80 N. E. Rep. 665, 11 Ann. Cas. 1; 127 Am. St. Rep. 40, Note; Barnes v. Midland R. Terminal Co., 193 N. Y. 378, 85 N. E. Rep. 1093, 127 Am. St. Rep. 962; 32 Cyc. 1272. Where under proper authority structures or objects are put upon lands below high water mark of the Ocean or Gulf or other navigable waters, the rights of adjoining riparian owners and ——— other ——— persons as well as the rights of the public must be observed in exercising the duly acquired privilege to so use the land below high water mark; and any substantial encroachment upon the rights of others may be remedied by timely and appropriate procedure in due course of law at the instance of proper parties; but the rights of individuals to remedy may be waived by undue delay or laches in seeking a remedy. The Riparian Acts of 1856 and 1921 are applicable only to "any navigable stream or bay of the sea or harbor." The *locus in quo* here is on the ocean front.

The shore line and the channel or line of general navigability may not run in the same direction so as to make the lines practically parrallel; and the boundary lines of lands that extend to the shore line may not run at right angle with the shore line or with the channel of the navigable waters. These conditions present questions as to the rights of riparian or littoral owners that require the ascertainment and application of appropriate rules to particular facts in each case as it is presented and developed for adjudication. See Merrill-Stevens Co. v. Durkee, 62 Fla.

549, 57 South. Rep. 428; Panama Ice & Fish Co. v. Atlantic & St. A. B. R. Co., 71 Fla. 419, 71 South Rep. 608; Thomas v. Ashland, S. & I. R. L. Ry. Co., 122 Wis. 519, 100 N. W. Rep. 993, 106 Am. St. Rep. 1000; Northern Pine-Land Co. v. Bigelow & Co., 84 Wis. 157, 54 N. W. Rep. 496, 21 L. R. A. 776; Montgomery v. Shaver, 40 Ore. 244, 66 Pac. Rep. 923; 3 Farnham on Waters, p. 2543, Paragraphs 873-4; Stuart v. Greanyea, 154 Mich. 132, 117 N. W. Rep. 655, 25 L. R. A. (N. S.) 257.

The eastern boundery of all the lots here considered, is the shore or high water mark of the ocean. The water having receded since the lots were platted there are perhaps from 50 to 100 feet of land between the present high water mark and the original eastern limits of the lots. This space appears on the plats as being between the lots and the present water line. Complainant's lot No. 6 adjoins defendant's lot No. 7 on the north, and defendant's triangular lot No. 8 is south of defendant's lot No. 7 and north of Biscayne Avenue. Lot No. 8 is a triangle 40 feet at the west and terminating in a point at the southeast corner of lot No.7, Biscayne Avenue being the southern boundry of lot No. 8.

The shore line apparently runs a little east of north from the south; the lot lines that extend to the water run south of east from the west, therefore the lot lines are practically at right angle with the shore. The street, Biscayne Avenue, that is immediately south of the triangular lot No. 8, runs approximately east and west to the shore line.

Riparian rights do not necessarily extend into the waters according to land boundry lines; nor do such rights, under all conditions, extend at right angles with the shore line. The parties do not own land below high water mark. Lines projected into the water opposite any of the lots at right angles with the *shore line* would encroach upon an extension of the *land lines* of the next lot north.

Complainant's riparian rights claimed here apparently extend into the water along lines run at right angles to the shore line of his lot. The defendant's riparian rights are similar. See Merrill-Stevens Co. v. Durkee, 62 Fla. 549, 57 South. Rep. 428.

The defendant's pier is being extended into the water from the present shore line opposite the north half of Biscayne Avenue and opposite defendant's lot No. 7. The extension is on lines that are perhaps 12 or 15 degrees north of true right angles to the shore line; consequently the outer portion of the pier is within lines extended from complainant's lot No. 6 at right angles to the shore line; this is the basis of the complaint here made. The outer portion of the pier obstructs to some extent the ocean view due east of the complainant's lot No. 6; but apparently the pier does not materially affect the complainant's access to and use of the navigable waters. The pier is being built upon submerged lands of the State and not upon any of complainant's land; and the partial obstruction to distant view looking due east from complainant's lot No. 6, will not justify an injunction when the complainant's right of access to the water is not materially impaired and when the complainant did not seek an injunction more promptly before defendant had made large expenditures under his permit which required the pier to be constructed as it apparently is being built practically" straight east parallel with the north line of Biscayne Avenue." See Tampa Southern R. Co. v. Nettles, 82 Fla. 2, 89 South. Rep. 223; Jenks v. Miller, 43 N. Y. Supp. 927. Sullivan v. Moreno 20 Fla. 200. Even if the pier is not constructed precisely at right angles from the shore line to the channel or navigable waters, the complainant has unimpaired access from his lot to the water and on to navigable water without any obstruction except that the route would be a little north of due east from complainant's lot. This inconvenience,

if any, and the obstruction to distant view looking due east from lot No. 6, caused by the outer portion of the pier, do not constitute such an injury to substantial rights of the complainant as would warrant relief by injuction sought after defendant had made large expenditures under permits, there being no showing that the pier is inherently injurious to the rights of complainant.

Of course the sovereign rights of the State or the powers of Congress in the premises are not affected by this adjudication.

Affirmed.

TERRELL AND BUFORD, J. J., concur.

ELLIS, C. J., AND STRUM AND BROWN, J. J., concur in the opinion.

BROWN, J., (Concurring).—I am inclined to the opinion that complainant's riparian rights under the facts of this particular case, extended into the waters at right angles to the general trend of the shore line of his lot, and his right of view out across the waters likewise. We have held this right of view to be one of the most valuable of the rights of the riparian proprietor. See Thiesen case, *Supra*. I do not understand the foregoing opinion to conflict with this doctrine; but the conclusion reached is well grounded upon the principle of laches and estoppel, as shown by the facts of this case, clearly stated in the opinion, whatever the riparian rights of complainants may have been.

STRUM J., concurs.