272 So.2d 209 (1973)
The BOARD OF TRUSTEES OF the INTERNAL IMPROVEMENT TRUST FUND of the State of Florida, Appellant,
v.
MEDEIRA BEACH NOMINEE, INC., a Georgia Corporation, Appellee.
No. 71-812.
District Court of Appeal of Florida, Second District.
January 26, 1973.
*211 Robert L. Shevin, Atty. Gen., Jerry E. Oxner, Asst. Atty. Gen., and M. Stephen Turner, Gen. Counsel, Board of Trustees, Tallahassee, for appellant.
Theodore C. Taub, of Gibbons, Tucker, McEwen, Smith, Cofer & Taub, Tampa, for appellee.
LILES, Acting Chief Judge.
This is an appeal from a final summary judgment in the Circuit Court for Pinellas County, ruling that the state had no interest in accreted lands and quieting title thereto in appellee.
Appellee, Medeira Beach Nominee, Inc., is owner of a tract of land on Sand Key in the City of Madeira Beach. The property lies between Gulf Boulevard and the waters of the Gulf of Mexico. The deeds conveyed all riparian rights and the westerly boundary was the mean high tide line. In February, 1971, appellee began construction of improvements, including a seawall upon the accreted land. In April, appellant Board of Trustees of the Internal Improvement Trust Fund of the State of Florida sued to enjoin further construction on the property for a distance approximately 115 feet landward of the existing mean high tide line, claiming same to be sovereignty lands. Appellee cross-claimed seeking to quiet title to the property and obtain a judicial determination of the westerly boundary. The trial judge granted summary judgment for appellee on its cross-claim.
The lands in dispute, or some undetermined part of them, were accreted in front of appellee's riparian uplands apparently as a result of a public erosion control and beach stabilization program, the first phase of which was completed in 1957 by the City of Madeira Beach. The program was financed by bond issue and special assessment of beachfront property. The 1957 program consisted of 37 wooden groins constructed on the beach below the existing mean high tide line, one of which was located in front of appellee's property. In 1968 the wooden panels of some or all of the groins were replaced with concrete slabs. These projects were carried out with the permission and authorization of the appropriate state and municipal agencies. While the parties agreed below that the natural processes of accretion were influenced by these projects, the trial court made no findings on the issues of when, where, how much and proximate cause. This was because these issues were not deemed material, the trial judge having determined that appellee would hold title to all the accreted lands even if no accretion would have occurred but for the state projects.
The question is: Does a strip of accreted land become the property of the upland riparian owner even where the accretion is the result of a lawful exercise of the police power by a municipality to prevent beach erosion?
Accretion is the gradual and imperceptible addition of soil to the shore of waterfront property. The test as to what is gradual and imperceptible is, that though witnesses may see from time to time that progress has been made, they could not perceive it while the process was going on. St. Clair County v. Lovingston, 90 U.S. (23 Wall.) 46, 68, 23 L.Ed. 59 (1874). Title to accreted lands by the great weight of *212 authority vests in the riparian owners of abutting lands. Brickell v. Trammell, 77 Fla. 544, 82 So. 221 (1919); Mexico Beach Corp. v. St. Joe Paper Co., 97 So.2d 708, 710 (1st D.C.A.Fla. 1957); cert. den. 101 So.2d 817 (1958).
The fact that the strip of land involved was true accretion is not in dispute. The disagreement between the parties appeared to be whether the established rule of law should be followed or whether there should be recognized or created an exception to the general rule. One exception to the general rule is that accretion does not belong to the riparian owner where the riparian himself causes the accretion. E.g., Brundage v. Knox, 279 Ill. 450, 117 N.E. 123 (1917); State v. Sause, 217 Or. 52, 342 P.2d 803 (1959). The reason for this exception is that since land below the ordinary high water mark is sovereignty land of the state, to permit the riparian owner to cause accretion himself would be tantamount to allowing him to take state land. Here the defendant riparian owner did nothing to cause the accretion to the uplands. Therefore, under the facts of this case, there is no exception to the general rule as stated above.
Historically, courts have attempted to distinguish between natural accretions and artificial accretions caused by the riparian owner. There is little authority for distinguishing between natural and artificial accretions generally. St. Clair County v. Lovingston, 90 U.S. (23 Wall.) 46, 23 L.Ed. 59 (1874). That case holds that whether the accretion is the effect of natural or artificial causes makes no difference. Contra, People v. Hecker, 179 Cal. App.2d 823, 4 Cal. Rptr. 334, 343 (2nd Dist. Div. 1 1960); South Shore Land Co. v. Petersen, 230 Cal. App.2d 628, 41 Cal. Rptr. 277, 279 (1st Dist. Div. 2 1967). The instant case is very similar in that the accretions there were caused by the erection of a dike connecting an island with the main shore of Illinois. The city of St. Louis, exercising its police power, caused the accretion, albeit unintentionally. The United States Supreme Court held that the riparian right to future alluvion or accretion is a vested right similar to the rights of a tree owner to the fruits of the tree.
The state urges that the court make a distinction between artificial accretion and artificial accretion produced by the state or municipality in the exercise of its police power. To do so would be usurping the authority vested in the Legislature to make sweeping changes in property rights assuming constitutional problems are properly avoided.
It would appear at first blush that Martin v. Busch, 93 Fla. 535, 112 So. 274 (1927), represents some support of authority for such a distinction. Upon examination the court in that case ruled that land exposed by a state program of draining Lake Okeechobee remained the property of the state even though that land was now upland of the ordinary high water mark. The court said:
"If to serve a public purpose, the state, with consent of the federal authority, lowers the level of navigable waters so as to make the water recede and uncover lands below the original high-water mark, the lands so uncovered below such high-water mark, continue to belong to the state." Id. 41 Cal. Rptr. at 287.
It therefore appears that decision deprived the upland owner of his status as a riparian. In order for the instant case to be analogous, the groin project of the City of Madeira Beach would have had to be intended to produce the accretion which occurred and the groin system would have to be in fact the cause of the accretion. Even if this were shown, we would not be inclined to follow the court's treatment of reliction in Martin in this case dealing with accretion.
There are four reasons for the doctrine of accretion: (1) de minimis non curat lex; (2) he who sustains the burden of losses and of repairs imposed by the contiguity of waters ought to receive whatever *213 benefits they may bring by accretion; (3) it is in the interest of the community that all land have an owner and, for convenience, the riparian is the chosen one; (4) the necessity for preserving the riparian right of access to the water. See, St. Clair County v. Lovingston, 90 U.S. (23 Wall.) 46, 67, 23 L.Ed. 59 (1874); Maloney, Plager and Baldwin, Water Law and Administration: The Florida Experience, page 386 (1968).
An additional reason behind the doctrine of accretion relates to the riparian owner's ability to use his land. The ordinary high water mark is well established as the dividing line between private riparian and sovereign or public ownership of the land beneath the water. This dividing line was not chosen arbitrarily.
The use of this dividing line has been reaffirmed in Hughes v. Washington, 389 U.S. 290, 88 S.Ct. 438, 19 L.Ed.2d 530 (1967), where the court reaffirmed the Lovingston accretion doctrine in a contest between the state and a private riparian. There the court said:
"Any other rule would leave riparian owners continually in danger of losing access to water which is often the most valuable feature of their property, and continually vulnerable to harassing litigation challenging the location of the original water lines." Id. at 293-294, 88 S.Ct. at 440-441.
It is apparent that the reasoning behind this line is demonstrated in the day to day utilization of the waterfront property by its riparian owner. Although the mean or high water mark is an average over a number of years, the daily mark of a high tide on the shore gives both the riparian and the public notice of their possible use of the land on either side of the mark. Freezing the boundary at a point in time, such as was done in Martin or as is suggested here by the state, not only does damage to all the considerations above but renders the ordinary high water mark useless as a boundary line clearly marking the riparian's rights and the sovereign's rights.
In this case the de minimis doctrine does not seem to apply initially due to the extent of the accretion involved. Nevertheless, the holding in this case will affect riparians other than those before us. What of riparians further along the shore where accretion is not as great? Should they be deprived of their status as riparians merely because the state wishes to claim title to one or two or ten feet of accreted land? If true accretion is the subject, i.e., a gradual and imperceptible buildup, the de minimis doctrine is applicable at all times regardless of the particular amount of buildup at a point in time. Were the state to gain title to this accreted land we believe that riparian titles around the state would be in jeopardy of unmarketability.
The second idea that the riparian owner who must risk the losses of erosion should gain the benefits of accretion is applicable here and, although not persuasive, is a fair and reasonable approach. It may be argued that the riparian here risks no erosion loss due to the existence of erosion control programs. Yet, the riparian here has paid for the additional benefits he has gained through the program by special assessment taxes. And, the program could have gone awry and contributed to erosion in which case he would not have been entitled to compensation. Paty v. Palm Beach, 158 Fla. 575, 29 So.2d 363 (1947).
Public policy weighs heavily in this decision as well. The public today stands in danger of losing access to beaches entirely in many places. Yet, quieting title here in the state will not solve the access problem. Nor will quieting title in the upland owner result in any loss of public rights in the foreshore or beach which the public always has a right to use. The foreshore between the mean high and low tide lines is public property.
*214 It should be remembered that even beachfront property owners are members of the public. Their status as riparian owners, however, has historically entitled them to greater rights, with respect to the waters which border their land, than inure to the public generally. They have the exclusive right of access over their own property to the water. Ferry Pass Inspectors' & Shippers' Ass'n v. Whites River Inspectors' & Shippers' Ass'n, 57 Fla. 399, 48 So. 643, 645 (1909). The public has no right to cross private property to reach navigable waters. See, Annot., 53 A.L.R. 1191 (1928); F.S. § 821.03 (1971), F.S.A. The riparian owner suffers special injury when a nuisance obstructs his right to navigation. See, e.g., Webb v. Giddens, 82 So.2d 743 (Fla. 1955). The riparian has the right to an unobstructed view over the waters (Thiesen v. Gulf, F. & A. Ry. Co., 75 Fla. 28, 58, 78 So. 491, 501 (1918)) subject to the rights of the public to pass along the shore (State ex rel. Taylor v. Simberg, 2 Fla. Supp. 178 (1952)). The impact of governmental regulation on the rights to swim and fish may be greater on the riparian than on the public. Thus, a police power regulation prohibiting swimming, fishing, or boating may be unchallengable by the public but constitute a taking with respect to a riparian. See, Richardson v. Beattie, 98 N.H. 71, 95 A.2d 122 (1953); People v. Hulbert, 131 Mich. 156, 91 N.W. 211 (1902). Riparians appear to have a qualified common law right to wharf out to navigable waters in the absence of a statute. Freed v. Miami Beach Pier Corp., 93 Fla. 888, 112 So. 841 (1927); Williams v. Guthrie, 102 Fla. 1047, 137 So. 682 (1931). The riparian has the right to make his water access available to the public in a commercial context. Webb v. Giddens, 82 So.2d 743 (Fla. 1955); Florio v. State ex rel. Epperson, 119 So.2d 305 (2d D.C.A.Fla. 1960). The riparian may make reasonable use of the water and may consume water in a reasonable manner. See, Cason v. Fla. Power Co., 74 Fla. 1, 76 So. 535 (1917); Koch v. Wick, 87 So.2d 47 (Fla. 1956).
Although this enumeration of riparian rights hardly exhausts the list it should be evident that quieting title in the state will little benefit the state while causing great harm to the appellee riparians. We see no reason for causing such a result. It should be noted that this case commenced in a suit by the state for injunctive relief, attempting to enjoin the riparian from building a seawall on the basis that it might thwart a public erosion control program. The defendant cross-claimed to quiet title to the accreted land and this is the basis upon which the case reached this court.
Finally, the state urges a retroactive application to Florida Statute § 161.051, F.S.A. which purports to vest title to accretions caused by public works in the state. The erosion projects here were begun in 1957 while the statute was enacted in 1965. Even if the statute is constitutional with respect to riparian owners we are not convinced that a legislative intent that the statute be applied retroactively has been shown. Statutes are presumed to be prospectively applied unless legislative intent to the contrary clearly appears. Miami v. Bd. of Public Instruction, 72 So.2d 901 (Fla. 1954); State ex rel. Hill v. Cone, 140 Fla. 1, 191 So. 50 (1939). Retroactive statutes may be invalid where they impair vested rights. The title of a statute intended to operate retrospectively should convey notice of that intent. See, Chiapetta v. Jordan, 153 Fla. 788, 16 So.2d 641 (1943). In view of the foregoing we do not believe Florida Statute § 161.051 should be applied here, especially where no substantial evidence has been taken to show that the erosion project was the cause of the accretion.
If, in fact, the state can show that erection of this seawall will endanger the effectiveness of Madeira Beach's erosion control program we have no doubt that an injunction to prevent the wall is a proper remedy. We see no reason to quiet title in the state merely to prevent the erection of *215 a seawall. Furthermore, we have stated other factors which we believe call for the opposite result.
The judgment is therefore affirmed.
HOBSON, J., and PIERCE, J., (Ret.) concur.