27 So.3d 48 (2006)
SAVE OUR BEACHES, INC. and Stop the Beach Renourishment, Inc., Appellants,
v.
FLORIDA DEPARTMENT OF ENVIRONMENTAL PROTECTION, The Board of Trustees of the Internal Improvement Trust Fund, City of Destin, and Walton County, Appellees.
No. 1D05-4086.
District Court of Appeal of Florida, First District.
April 28, 2006.
Order Denying Rehearing and Rehearing En Banc and Granting Certification July 3, 2006.
*50 Richard S. Brightman and D. Kent Safriet of Hopping Green & Sams, P.A., Tallahassee, for Appellants.
Gregory M. Munson, General Counsel, and Charles T. "Chip" Collette and Mark S. Miller, Senior Assistant General Counsels, Florida Department of Environmental Protection, Tallahassee; Kenneth J. Plante, Kelly B. Plante and Tana D. Storey of Roetzel & Andress, L.P.A., Tallahassee, for Appellees.
POLSTON, J.
Appellants challenge a July 27, 2005 final order entered by appellee Florida Department of Environmental Protection, determining that a Joint Coastal Permit and Authorization to Use Sovereign Submerged Lands, that allows the renourishment of 6.9 miles of beaches and dunes within the City of Destin and Walton County, was properly issued. Appellants argue that the final order unconstitutionally applies Part I of Chapter 161, Florida Statutes (2005), referred to as the Beach and Shore Preservation Act. We agree that constitutionally protected riparian rights have been deprived without just compensation for the property taken, therefore, we reverse and remand.

I. BACKGROUND

A. The Project

The Gulf of Mexico beaches of the City of Destin and Walton County were critically eroded by Hurricane Opal in 1995. The erosion problem was identified by the Department, which placed these beaches on its list of critically-eroded beaches. Destin and Walton County then initiated a lengthy process of beach restoration through renourishment. The process, which included extensive studies and construction design and pre-application conferences with Department staff, culminated in the filing of an Application for a Joint Coastal Permit and Authorization to Use Sovereign Submerged Lands on July 30, 2003.
The application proposed to dredge sand from an ebb shoal borrow area south of East Pass in eastern Okaloosa County, using either a cutter head dredge (which disturbs the sand on the bottom of the borrow area and vacuums it into a pipeline which delivers it to the project area) or a hopper dredge (which fills itself and is moved to the project site). On the project site, heavy equipment moves the dredged sand as specified in the design plans. The project is executed in this manner and progresses along the beach, usually at a pace of about 300 to 500 feet a day. Each day work is in progress, public access to *51 the beach is restricted for a length of about 500 to 1,000 feet in the immediate vicinity of the area of beach being worked.
After requests for additional information and responses to those requests, the Department issued a Notice of Intent to Issue the permit, DEP JCP File No. 0218419-001-JC (Draft Permit), on July 15, 2004. Appellants Save Our Beaches, Inc. and Stop the Beach Renourishment, Inc. timely filed a petition for formal administrative hearing challenging issuance of the Draft Permit. Stop the Beach Renourishment also filed a petition for formal administrative hearing challenging the county erosion control line established by the Board of Trustees of the Internal Improvement Fund, in conjunction with the proposed beach restoration project. The two cases were consolidated for administrative hearing.
Appellants' constitutional challenges were deferred for determination in court proceedings. The issues in the administrative hearing were whether Destin and Walton County gave reasonable assurance that applicable water quality standards will not be violated and whether Destin and Walton County have obtained, or are able to obtain, all requisite private property rights necessary to implement the proposed project. In the recommended order, the administrative law judge ("ALJ") found that Destin and Walton County gave reasonable assurances that the applicable water quality standard will not be violated. That water quality finding was adopted by the Department in its final order and this finding was not challenged by appellants on appeal.
On June 30, 2005, the ALJ recommended that the Department enter a final order issuing the permit. The Department entered its final order on July 27, 2005, determining that the Joint Coastal Permit and Authorization to Use Sovereign Submerged Lands was properly issued pursuant to existing statutes and rules.

B. Applicable Statutes and Rules

The Joint Coastal Permit and Authorization to Use Sovereign Submerged Lands includes two separate permits and an authorization. The two permits are (i) a coastal construction permit issued pursuant to Chapter 161, Florida Statutes[1], and Florida Administrative Code Chapter 62B-41, and (ii) a wetland/environmental resource permit issued pursuant to Chapter 373, Florida Statutes, and Florida Administrative Code Chapter 62-312. The authorization includes a proprietary authorization to use sovereign submerged lands, pursuant to Chapter 253, Florida Statutes, and Florida Administrative Code Chapter 18-21.
Florida Administrative Code Chapter 62B-49, entitled "Joint Coastal Permits and Concurrent Processing of Proprietary Authorizations," does not change the substantive requirements for obtaining these *52 two permits and authorization, but provides a procedural mechanism for processing all three components of the joint coastal permit and authorization at the same time. Rule 62B-49.001 provides in pertinent part that proprietary authorizations pursuant to Florida Administrative Code Chapter 18-21 are applicable to the review of joint coastal permits. The relevant part of Rule 18-21.004(3) provides:
Riparian Rights.
(a) None of the provisions of this rule shall be implemented in a manner that would unreasonably infringe upon the traditional, common law riparian rights, as defined in Section 253.141, F.S., of upland property owners adjacent to sovereignty submerged lands.
(b) Satisfactory evidence of sufficient upland interest is required for activities on sovereignty submerged lands riparian to uplands, unless otherwise specified in this chapter. Public utilities and state and other governmental agencies proposing activities such as utility lines, roads or bridges must obtain satisfactory evidence of sufficient upland interest prior to beginning construction, but need not provide such evidence as part of any required application. Satisfactory evidence of sufficient upland interest is not required for activities on sovereignty submerged lands that are not riparian to uplands, or when a governmental entity conducts restoration and enhancement activities, provided that such activities do not unreasonably infringe on riparian rights.

Fla. Admin. Code R. 18-21.004(3) (emphasis added).
Appellants argued in the administrative proceeding that Destin and Walton County did not provide "satisfactory evidence of sufficient upland interest."[2] The ALJ ruled that such evidence was not necessary because the application "falls squarely within the exception in the last sentence of Rule 18-21.004(3)(b), supra: no evidence of an upland interest is necessary 'provided that such activities do not unreasonable infringe on riparian rights.'"
The Department adopted the ALJ's ruling that the project does not unreasonably infringe on riparian rights. The ALJ noted that the right to accretion is a riparian right, but ruled that, under the pertinent statutes, the riparian right to accretions (as well as the risk of erosion) will be eliminated upon recording of the erosion control line required by statute. Section 161.141 provides:
The Legislature declares that it is the public policy of the state to cause to be fixed and determined, pursuant to beach restoration, beach nourishment, and erosion control projects, the boundary line between sovereignty lands of the state bordering on the Atlantic Ocean, the Gulf of Mexico, or the Straits of Florida, and the bays, lagoons, and other tidal reaches thereof, and the upland properties adjacent thereto; except that such boundary line shall not be fixed for beach restoration projects that result from inlet or navigation channel maintenance dredging projects unless such *53 projects involve the construction of authorized beach restoration projects. However, prior to construction of such a beach restoration project, the board of trustees must establish the line of mean high water for the area to be restored; and any additions to the upland property landward of the established line of mean high water which result from the restoration project remain the property of the upland owner subject to all governmental regulations and are not to be used to justify increased density or the relocation of the coastal construction control line as may be in effect for such upland property. The resulting additions to upland property are also subject to a public easement for traditional uses of the sandy beach consistent with uses that would have been allowed prior to the need for the restoration project. It is further declared that there is no intention on the part of the state to extend its claims to lands not already held by it or to deprive any upland or submerged land owner of the legitimate and constitutional use and enjoyment of his or her property. If an authorized beach restoration, beach nourishment, and erosion control project cannot reasonably be accomplished without the taking of private property, the taking must be made by the requesting authority by eminent domain proceedings.

§ 161.141, Fla. Stat. (2005) (emphasis added).
Section 161.161(3) provides that "[o]nce a project is determined to be undertaken, a survey of all or part of the shoreline within the jurisdiction of the local government in which the beach is located shall be conducted in order to establish the area of beach to be protected by the project and locate an erosion control line." The Board of Trustees "shall approve or disapprove the erosion control line for a beach restoration project," and in locating the line "shall be guided by the existing line of mean high water." See § 161.161(5), Fla. Stat. (2005). Section 161.181 provides that, if no review is taken, or if the Board's decision is upheld on review, the Board shall file its resolution approving the erosion control line in the public records and record the survey showing the area of beach to be protected and the erosion control line in the book of plats of the county or counties where the erosion control line lies.
Significantly, section 161.191 provides that the erosion control line becomes the new property boundary, denying the upland landowners any property gained by accretion:
(1) Upon the filing of a copy of the board of trustees' resolution and the recording of the survey showing the location of the erosion control line and the area of the beach to be protected as provided in s. 161.181, title to all lands seaward of the erosion control line shall be deemed to be vested in the state by right of its sovereignty, and title to all lands landward of such line shall be vested in the riparian upland owners whose lands either abut the erosion control line or would have abutted the line if it had been located directly on the line of mean high water on the date the board of trustees' survey was recorded.
(2) Once the erosion control line along any segment of the shoreline has been established in accordance with the provision of ss. 161.141-161.211, the common law shall no longer operate to increase or decrease the proportions of any upland property lying landward of such line, either by accretion or erosion or by any other natural or artificial process, except as provided in s. 161.211(2) and (3). However, the state shall not extend, or permit to be extended *54 through artificial means, that portion of the protected beach lying seaward of the erosion control line beyond the limits set forth in the survey recorded by the board of trustees unless the state first obtains the written consent of all riparian upland owners whose view or access to the water's edge would be altered or impaired.
§ 161.191, Fla. Stat. (2005) (emphasis added).
Notwithstanding the recognition that the upland landowners' titles have been altered by operation of statute, section 161.201 states that the landowners continue to be entitled to all of their riparian rights:

Any upland owner or lessee who by operation of ss. 161.141-161.211 ceases to be holder of title to the mean high-water line shall, nonetheless, continue to be entitled to all common-law riparian rights except as otherwise provided in s. 161.191(2), including but not limited to rights of ingress, egress, view, boating, bathing, and fishing. In addition the state shall not allow any structure to be erected upon lands created, either naturally or artificially, seaward of any erosion control line fixed in accordance with the provisions of ss. 161.141-161.211, except such structures required for the prevention or erosion. Neither shall such use be permitted by the state as may be injurious to the person, business, or property of the upland owner or lessee; and the several municipalities, counties and special districts are authorized and directed to enforce this provision through the exercise of their respective police powers.
§ 161.201, Fla. Stat. (2005) (emphasis added).
The final order expressly recognized that at least two riparian rights, (i) the right to receive accretions and relictions to the property, and (ii) the right to have the property's contact with the water remain intact, were eliminated by section 161.191. However, the final order found no "infringement" of these riparian rights. This finding was based solely on the fact that the elimination of these rights was authorized by section 161.191.
The ALJ reasoned, in the recommended order adopted by the Department, that "[s]ince the [p]roject cannot proceed without recording of the established ECL [erosion control line], there will be no infringement of any right to accretion, assuming the constitutionality of these statutes."[3] (Emphasis added). The ALJ, citing Board of Trustees of the Internal Improvement Trust Fund v. Sand Key Associates, Ltd., 512 So.2d 934, 936 (Fla.1987), also ruled that the riparian "`right to have the property's contact with the water remain intact' ... would be eliminated by establishment of the ECL [erosion control line], assuming the constitutionality of the pertinent statutes." The Department, in its final order, essentially ruled that there is no infringement of any riparian rights because the statutes say there is not.

II. STANDING

A. Administrative Proceeding

Because the constitutional challenge at issue in this case could not be brought in *55 the administrative action, see Gulf Pines Memorial Park, Inc. v. Oaklawn Memorial Park, Inc., 361 So.2d 695, 699 (Fla. 1978), the only issues heard related to water quality standards and whether Destin and Walton County have obtained, or are able to obtain, all requisite private property rights necessary to implement the proposed project. During the administrative proceeding, appellees challenged appellants' standing to bring the administrative action.
It is undisputed that Save Our Beaches and Stop the Beach Renourishment do not themselves own property in the area affected by the proposed project and will not be otherwise affected by the project. Therefore, their standing is associational and is derived from representation of their members. Both Save Our Beaches and Stop the Beach Renourishment were incorporated not for profit in Florida for the purpose of protecting and defending the natural resources of the beaches, protecting private property rights, and seeking redress of past, present, and future authorized and/or inappropriate beach restoration activities.
Save Our Beaches has approximately 150 members. These members own approximately 112 properties in Destin, consisting of approximately 62 beachfront properties and 50 condominium units of beachfront condominium developments. The ALJ stated that it was not clear from the evidence how many of the beachfront properties are in the affected area other than four identified by testimony of one witness. Accordingly, the ALJ ruled that this organization failed to meet the associational requirements to appear in the administrative proceeding.
Stop the Beach Renourishment has six members, all owners of beachfront property in the area of the proposed project.[4] The ALJ found that all six members would be affected by the project if it significantly reduced water quality, infringed on riparian rights, or proceeded without their required consent, as alleged. The ALJ ruled that this organization had standing to appear in the administrative proceeding.
In its final order, the Department adopted the ALJ's standing rulings relating to the administrative proceeding. Appellants bring only an as-applied constitutional challenge on appeal and do not seek reversal on the Department's standing rulings or any of the other rulings on the merits from the administrative proceedings.

B. Appealthe Constitutional Challenge

Appellees argue that the court lacks jurisdiction, citing Florida Chapter of the Sierra Club v. Suwannee American Cement Co., Inc., 802 So.2d 520 (Fla. 1st DCA 2001), because appellants Save Our Beaches and Stop the Beach Renourishment lack standing to bring their constitutional challenge on behalf of their individual members in this appeal. In Sierra Club, the court held that the organizational appellants did not have standing to appeal the Department's order granting a permit and dismissed the appeal. The court noted that section 120.68(1), Florida Statutes, allows judicial review of a final order only by "a party who is adversely affected." Id. at 521. The court noted that the organizations had only a generalized interest in the environment and had failed to provide evidence that their individual members would be adversely affected by the Department's order. Id. at 522-23.
*56 For the same reasons given by the ALJ in the administrative proceeding, we agree with appellees that, as in Sierra Club, Save Our Beaches has provided no facts that its individual members will be sufficiently adversely affected to satisfy the requirements of section 120.68(1). Accordingly, we dismiss the appeal by Save Our Beaches. Id. at 523.
However, unlike the organizations in Sierra Club, all of the individual members in Stop the Beach Renourishment own property in the affected area. Competent substantial evidence for this factual finding by the ALJ is found in the unrebutted testimony of Mr. Slade Lindsey, one of the six members. Mr. Lindsey testified that all six members owned waterfront property, up to the mean high water line, in the area of the proposed project. The ALJ found that all six members would be affected by the project if it significantly reduced water quality, infringed on riparian rights, or proceeded without their required consent, as alleged.
We reject appellees' argument that associations cannot bring constitutional challenges. See Pennell v. City of San Jose, 485 U.S. 1, 108 S.Ct. 849, 99 L.Ed.2d 1 (1988) (holding that an unincorporated association organized for the purpose of representing the interests of owners and lessors of real property had standing to assert that the application of the city rent control ordinance violated the Fifth and Fourteenth Amendments' prohibition against taking of private property for public use without just compensation); Hunt v. Wash. State Apple Adver. Comm'n, 432 U.S. 333, 342-45, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977) (holding that the Commission had standing to challenge the constitutionality of a North Carolina statute; "[i]f the Commission were a voluntary membership organization-a typical trade association-its standing to bring this action as the representative of its constituents would be clear under prior decisions of this Court," collecting cases). The only cases cited by appellees in support of their argument on this issue do not involve associations. See e.g., Sieniarecki v. State, 756 So.2d 68, 76 (Fla.2000) (holding that a daughter being prosecuted for neglect of a disabled person, arising from the death of her mother, had no vicarious right to assert her mother's Florida constitutional right of privacy to refuse medical treatment).
Accordingly, we hold that Stop the Beach Renourishment ("STBR") has satisfied the requirements of section 120.68(1) and we have jurisdiction because it has standing to bring this appeal.

III. RIPARIAN RIGHTS
STBR argues that the final order unconstitutionally applies the Beach and Shore Preservation Act, by taking private property without compensation. This claim is properly before us for determination. See Key Haven Associated Enters., Inc. v. Bd. of Trs. of the Internal Improvement Trust Fund, 427 So.2d 153, 158 (Fla.1982) (ruling that the district court, sitting in its review capacity, is "a proper forum to resolve this type of constitutional challenge [unconstitutional application of a statute or agency rule] because those courts have the power to declare the agency action improper and to require any modifications in the administrative decision-making process necessary to render the final agency order constitutional").
Riparian rights are property rights that cannot be constitutionally taken without just compensation. See Bd. of Trs. of the Internal Improvement Trust Fund v. Sand Key Assocs., Ltd., 512 So.2d 934, 936 (Fla.1987) (noting that "[t]he term `riparian owner' applies to waterfront owners along a river or stream, and `littoral owner' *57 applies to waterfront owners abutting an ocean, sea, or lake. Cases and statutes, however, have used 'riparian owner' broadly to describe all waterfront owners;" the Court has "held that riparian or littoral rights are legal rights and, for constitutional purposes, the common law rights of riparian and littoral owners constitute property"); Thiesen v. Gulf, F. & A. Ry. Co., 75 Fla. 28, 78 So. 491, 506 (1918) (ruling that the act at issue, purporting to grant the submerged land between the high and low water marks lying in front of the land of a riparian owner to a railroad company, "undertakes to deprive without compensation the owner of lots, the boundaries of which extend to high-water mark of the bay, lying within the area covered by the map of the water front referred to in the act, of their rights under the common law as riparian owners. We have said that the rights of a riparian owner at common law constituted property of which he could not be deprived without just compensation."); Lee County v. Kiesel, 705 So.2d 1013, 1015 (Fla. 2d DCA 1998); Kendry v. State Road Dep't, 213 So.2d 23, 28 (Fla. 4th DCA 1968).
"Riparian and littoral property rights consist not only of the right to use the water shared by the public, but include the following vested rights: (1) the right of access to the water, including the right to have the property's contact with the water remain intact[5]; (2) the right to use the water for navigational purposes; (3) the right to an unobstructed view of the water; and (4) the right to receive accretions[6] and relictions to the property." Sand Key Assocs., 512 So.2d at 936.
Section 253.141(1), Florida Statutes (2005) describes riparian rights:
(1) Riparian rights are those incident to land bordering upon navigable waters. They are rights of ingress, egress, boating, bathing, and fishing and such others as may be or have been defined by law. Such rights are not of a proprietary nature. They are rights inuring to the owner of the riparian land but are not owned by him or her. They are appurtenant to and are inseparable from the riparian land. The land to which the owner holds title must extend to the ordinary high watermark of the navigable water in order that riparian rights may attach. Conveyance of title to or lease of the riparian land entitles the grantee to the riparian rights running therewith whether or not mentioned in the deed or lease of the upland.
(Emphasis added). Whatever differences may exist between this statute and common law, they do not affect the analysis of the issues in the case before us. See Theresa Bixler Proctor, Erosion of Riparian Rights Along Florida's Coast, 20 Fla. St. U.J. Land Use & Envtl. L. 117, 131-35 (2004) (describing the history of this statute and noting that differences between the statute and common law have yet to be determined). The express language of the statute stating "and such others [riparian rights] as may be or have been defined by *58 law," indicates that the statute does not completely replace the common law. Moreover, the legislature explicitly recognizes in section 161.201 that common law riparian rights continue to exist. See § 161.201, Fla. Stat. (2005) (providing that upland owners "continue to be entitled to all common-law riparian rights except as otherwise provided in s. 161.191(2) [eliminating right of accretion] ....") (emphasis added).
As described below, we agree with STBR's argument that its members' riparian rights to (i) receive accretions and relictions to the property, and (ii) have the property's contact with the water remain intact, were eliminated by the Department's final order. Because their riparian rights were unconstitutionally taken without an eminent domain proceeding as required by section 161.141, those rights have been infringed upon. Because those riparian rights have been infringed, contrary to the Department's ruling, satisfactory evidence of sufficient upland interest required by rule 18-21.004(3) must be provided.

A. The Boundary

Florida law provides that "a riparian or littoral owner owns to the line of the ordinary high water mark on navigable waters." Sand Key Associates, Ltd., 512 So.2d at 936. See also Bd. of Trs. of the Internal Improvement Trust Fund v. Medeira Beach Nominee, Inc., 272 So.2d 209, 213 (Fla. 2d DCA 1973) (stating that "[t]he ordinary high water mark is well established as the dividing line between private riparian and sovereign or public ownership of the land beneath the water"); Art. X, § 11, Fla. Const. ("Sovereignty lands. The title to lands under navigable waters, within the boundaries of the state, which have not been alienated, including beaches below mean high water lines, is held by the state, by virtue of its sovereignty, in trust for all the people....") (emphasis added); Teat v. City of Apalachicola, 738 So.2d 413, 414 (Fla. 1st DCA 1999) (stating that "[c]urrently, the State's ownership extends up to the ordinary high water mark of navigable waterways, and an individual must own property down to the ordinary high water mark in order to possess riparian rights," citing Florida Statutes including section 253.141).
The Florida Coastal Mapping Act of 1974 contains uniform standards and procedures relating to the coastal boundaries:
The Legislature recognizes the desirability of confirmation of the mean high-water line, as recognized in the State Constitution and defined in s. 177.27(15) as the boundary between state sovereignty land and uplands subject to private ownership, as well as the necessity for uniform standards and procedures with respect to the establishment of local tidal datums and the determination of the mean high-water and mean low-water lines, and therefore directs that uniform standards and procedures be developed.
§ 177.26, Fla. Stat. (2005). See § 177.27(15), Fla. Stat. (2005) ("`Mean high-water line' means the intersection of the tidal plane of mean high water with the shore"); § 177.27(14), Fla. Stat. (2005) ("`Mean high water' means the average height of the high waters over a 19-year period. For shorter periods of observation, `mean high water' means the average height of the high waters after corrections are applied to eliminate known variations and to reduce the result to the equivalent of a mean 19-year value.").
The court in Medeira Beach described why the use of the high water mark as a boundary is important:
The use of this dividing line has been reaffirmed in Hughes v. Washington, *59 389 U.S. 290, 88 S.Ct. 438, 19 L.Ed.2d 530 (1967), where the court reaffirmed the [St. Clair County v.] Lovingston [90 U.S. (23 Wall.) 46, 23 L.Ed. 59 (1874)] accretion doctrine in a contest between the state and a private riparian. There the court said:
"Any other rule would leave riparian owners continually in danger of losing access to water which is often the most valuable feature of their property, and continually vulnerable to harassing litigation challenging the location of the original water lines." Id. at 293-294, 88 S.Ct. at 440-441.
It is apparent that the reasoning behind this line is demonstrated in the day to day utilization of the waterfront property by its riparian owner. Although the mean or high water mark is an average over a number of years, the daily mark of a high tide on the shore gives both the riparian and the public notice of their possible use of the land on either side of the mark. Freezing the boundary at a point in time, such as was done in Martin or as is suggested here by the state, not only does damage to all the considerations above but renders the ordinary high water mark useless as a boundary line clearly marking the riparian's rights and the sovereign's rights.

Medeira Beach, 272 So.2d at 213 (emphasis added).
The erosion control line was established by the Board of Trustees on the high water mark. That became the fixed new boundary of the property. See § 161.191(1), Fla. Stat. (2005) (stating in relevant part that "[u]pon the filing of a copy of the board of trustees' resolution and recording of the survey showing the location of the erosion control line ... title to all lands seaward of the erosion control line shall be deemed to be vested in the state by right of its sovereignty, and title to all lands landward of such line shall be vested in the riparian upland owners"). As in Medeira Beach, the freezing of the erosion control line renders the ordinary high water mark useless as a boundary line, which is contrary to the property owners' boundaries. Although STBR's members' deeds are not in the record, there is unrebutted testimony that their property boundaries extend to the high water mark.

B. Deprivation of Riparian Rights

The parties agree that this project will cause the high water mark to move seaward and ordinarily this would result in the upland landowners gaining property by accretion. However, section 161.191(2) states that "the common law shall no longer operate to increase or decrease the proportions of any upland property lying landward of such line, either by accretion or erosion...." Therefore, the Department's final order, approving the permits and authorization for the project, will deprive STBR's members of their riparian accretion rights.
Moreover, because the boundary will now remain fixed, as the high water mark moves seaward, the landowners will also lose the right to have the property's contact with the water remain intact. It is not enough to provide, as in section 161.201, rights of ingress and egress to the water over the state's land.
These deprivations of riparian rights are an unconstitutional taking of STBR's members' riparian rights. The Department relied on section 161.201 to rule that the landowners' riparian rights are not affected by its final order. Although section 161.201 has language describing a preservation of common law riparian rights, it does not actually operate to preserve the rights at issue in this case. *60 Florida's law is clear that riparian rights cannot be severed from riparian uplands absent an agreement with the riparian owner, not even by the power of eminent domain. See Belvedere Dev. Corp. v. Dep't. of Transp., 476 So.2d 649 (Fla.1985) (holding that a property was taken without an award for damages in violation of the Florida Constitution when the Department sought to acquire the property in fee simple absolute with an express reservation to the landowners of the rights to use and enjoy the riparian rights of and pertaining to the land).
Belvedere controls by explicitly holding that the riparian rights cannot be constitutionally reserved to the landowners as described in section 161.201. Id. at 652 (ruling that "in the context of condemnation of property, we think the condemnor should be unable to reserve the riparian rights to the condemnee in the absence of an express bilateral agreement to do so with the condemnee;" and concluding that "the act of condemning petitioners' lands without compensating them for their riparian property rights under these facts was an unconstitutional taking"). See also § 253.141(1), Fla. Stat. (2005) (stating that riparian rights "are inseparable from the riparian land"). Therefore, the statutory "reservation" of STBR's members' riparian rights is legally invalid with the effect that as applied in this case, the Beach and Shore Preservation Act deprives the members of their constitutionally protected riparian rights without just compensation for the property taken. Because those riparian rights have been infringed, contrary to the Department's ruling, satisfactory evidence of sufficient upland interest required by rule 18-21.004(3) must be provided.

Conclusion
Accordingly, we reverse the Department's final order approving the Joint Coastal Permit and Authorization to Use Sovereign Submerged Lands. We remand for the Department to provide satisfactory evidence of sufficient upland interest pursuant to Florida Administrative Code Rule 18-21.004(3)(b). As provided by section 161.141, Florida Statutes (2005), if the project "cannot reasonably be accomplished without the taking of private property, the taking must be made by the requesting authority by eminent domain proceedings."[7] To the extent that the Board of Trustees recorded a resolution and survey in the public records showing a boundary of STBR's members' property that is different from their deeds, the resolution and survey are declared invalid as to the members' property boundaries.
REVERSED and REMANDED with directions.
KAHN, C.J. and LEWIS, J., concur.
POLSTON, J.

On Motions for Rehearing, Rehearing En Banc, and/or for Certification
Appellees' motions for rehearing and rehearing en banc are denied. Appellees' motions for certification are granted to the extent that we certify the following question to be of great public importance:

Has Part I of Chapter 161, Florida Statutes (2005), referred to as the Beach and Shore Preservation Act, been unconstitutionally applied so as to deprive the members of Stop the Beach Renourishment, Inc. of their riparian rights without just compensation for the property taken, so that the exception provided in Florida Administrative *61 Code Rule 18-21.004(3), exempting satisfactory evidence of sufficient upland interest if the activities do not unreasonably infringe on riparian rights, does not apply?

KAHN, C.J. and LEWIS, J., CONCUR.
NOTES
[1] Unless otherwise noted, all statutes and rules referenced are to 2005, when the administrative proceeding concluded. See Fla. Admin. Code Rules 18-21.00401(5) and 62-312.065(5); Lavernia v. Dep't of Prof'l Regulation, Bd. of Med., 616 So.2d 53, 53-54 (Fla. 1st DCA 1993) (stating that "Florida follows the general rule that a change in a licensure statute that occurs during the pendency of an application for licensure is operative as to the application, so that the law as changed, rather than as it existed at the time the application was filed, determines whether the license should be granted"); 51 Am.Jur.2d Licenses and Permits § 79 (2005) (stating, "[i]n general, a change in the law pending an application for a permit or license is operative as to the application, so that the law as changed, rather than as it existed at the time the application was filed, determines whether the permit or license should be granted"). There have been no applicable substantive changes in the relevant statutes and rules since the application was filed in 2003.
[2] Florida Administrative Code Rule 18-21.003(55) defines "satisfactory evidence of sufficient upland interest" as: "documentation, such as warranty deed; a certificate of title issued by a clerk of the court; a lease; an easement; or condominium, homeowners or similar association documents that clearly demonstrate that the holder has control and interest in the riparian uplands adjacent to the project area and the riparian rights necessary to conduct the proposed activity. Other forms of documentation shall be accepted if they clearly demonstrate that the holder has control and interest in the riparian uplands adjacent to the project area and the riparian rights necessary to conduct the proposed activity."
[3] The Department assumes the constitutionality of the statutes because it must give full effect to the statutes, rather than question their constitutional validity. See State ex rel. Atl. Coast Line R. Co. v. State Bd. of Equalizers, 84 Fla. 592, 94 So. 681, 682 (1922) (reasoning that "[e]very law found upon the statute books is presumptively constitutional until declared otherwise by the courts," and that "ministerial officers must obey it, until in a proper proceeding its constitutionality is judicially passed upon").
[4] The six members are Slade Lindsey, Lionel D. Alford, Jr., Tammy N. Alford, Janet R. Frost, Mark Styslinger, and Suzy Spence.
[5] See also Bd. of Trs. of the Internal Improvement Trust Fund v. Medeira Beach Nominee, Inc., 272 So.2d 209, 214 (Fla. 2d DCA 1973) (recognizing that riparian owners "have the exclusive right of access over their own property to the water").
[6] In Sand Key Associates, the Court rejected the state's argument that it owned all accretions caused by the construction of a jetty on oceanfront property on Sand Key in Pinellas County, Florida, because it was artificially created by the state. 512 So.2d at 937-38. The Court also noted that "the common law has never allowed a waterfront owner to receive title to artificially created accretions when he caused those additions to his land by improvements. In this circumstance, title to the accreted land remains with the sovereign." Id. at 938.
[7] We do not address whether an eminent domain proceeding will be required or what property would be subject to the proceeding. Those issues are not before us in this case.