512 So.2d 934 (1987)
BOARD OF TRUSTEES OF THE INTERNAL IMPROVEMENT TRUST FUND, Petitioner,
v.
SAND KEY ASSOCIATES, LTD., Respondent.
No. 66372.
Supreme Court of Florida.
July 9, 1987.
Rehearing Denied September 9, 1987.
Steven A. Been, Asst. Gen. Counsel, Dept. of Natural Resources, Tallahassee, for petitioner.
Richard J. Salem of Richard J. Salem, P.A., Tampa, and William J. Kimpton of Dunbar, Kimpton, Burke, Boyer, Roman and Schafer, P.A., Clearwater Beach, for respondent.
OVERTON, Justice.
This is a petition to review Sand Key Associates, Ltd., v. Board of Trustees of the Internal Improvement Trust Fund, 458 So.2d 369 (Fla. 2d DCA 1984), in which the district court upheld the constitutionality of section 161.051, Florida Statutes (1981), determined that it did not apply to the accreted land of the waterfront property owned by Sand Key Associates, and certified the following question as one of great public importance:
Pursuant to section 161.051, Florida Statutes (1981), is the state entitled to accreted land of only the upland owner of the improved property or to the accreted land of all upland littoral owners, whether or not they participated in or contributed to the improvement?
Id. at 371. We have jurisdiction, article V, section 3(b)(4), Florida Constitution, and approve the district court decision. We answer the question by holding that section *935 161.051 applies to accreted land of an upland owner who caused the accretion and does not apply to an upland owner who did not participate in the improvements which caused the accretions.
The issue in this cause is narrow, but has broad ramifications for Florida's waterfront owners. It concerns the state's right to claim title to land accumulated on waterfront property when the accumulation occurred slowly and imperceptibly and was not caused by the waterfront owner.
Sand Key began this action by filing suit to quiet title to lands it alleged had gradually and imperceptibly accumulated over ten years on its beachfront property. The Trustees of the Internal Improvement Trust Fund claimed that public beach renourishment, authorized under chapter 161, Florida Statutes, created the accreted lands out of submerged sovereignty lands, and that, pursuant to section 161.051, these accreted lands remain state property. The trial court entered a partial final summary judgment in favor of the Trustees. Before its ruling, the trial court found: (1) a public entity had constructed a jetty; (2) Sand Key's waterfront property extends approximately one-half mile south of this jetty; (3) "the gradual and imperceptible accumulation of soil to [Sand Key's] upland was the result of accretion"; (4) "neither [Sand Key] nor anyone acting on its behalf ... caused or contributed to [the] accretion." (Emphasis added.) The trial court then upheld the constitutionality of section 161.051, and construed it, in accordance with the Trustee's interpretation, to mean that
the State of Florida validly holds title to all accretion to the upland, whether proximate or remote, of any person which results from works and/or projects specifically described in the said statute, and not only to accretion to the upland of a person who has constructed or installed such a work or project.
(Emphasis added.) The trial court concluded by denying Sand Key possession of the accreted land.
The district court reversed, holding:
To the extent that section 161.051 applies to other upland littoral owners who neither participated in nor contributed to the improvement, the statute is in derogation of the common law and must be strictly construed. The presumption is that no change in the common law is intended unless the statute explicitly so states... .
Section 161.051 does not explicitly state that it applies to all upland littoral owners. Therefore, construing the statute strictly, we hold that it applies only to the upland owner of the improved property. Section 161.051 does not affect Sand Key's vested right to accretion on its property.
458 So.2d at 371 (citation omitted). The district court concluded that the trial court judgment "effectively divested Sand Key of its littoral rights without compensation" and held that "the disputed five acres of accreted property, all future accretions on the property and all property rights incident thereof belong to Sand Key." Id.
In this proceeding, the Trustees raise three claims of title to the accreted lands. First, they claim that all accretions caused in part by some type of artificial construction are state property, asserting that, although Florida's waterfront property owners are entitled to accretions and relictions which result from natural causes, they are not entitled to accretions or relictions that result only in part from artificial causes. Second, the Trustees assert that, even if prior law granted waterfront owners title to artificially caused accretions, section 161.051 changed the law and established an exception to the right to the accretions. Third, the Trustees contend that Martin v. Busch, 93 Fla. 535, 112 So. 274 (1927), controls under these circumstances and mandates state ownership of the accretions. Under each contention, the Trustees assert that the state owns the accreted land and that this Court need not consider whether the affected waterfront owner contributed to causing the accretion.
We find the Trustees' contentions are without merit. They disregard Florida case law establishing and applying common *936 law riparian and littoral rights, misconstrue section 161.051, and misinterpret Martin v. Busch.

Common Law Definitions and Principles
Because of the Trustees's position, it is appropriate to review common law definitions and principles. The term "riparian owner" applies to waterfront owners along a river or stream, and "littoral owner" applies to waterfront owners abutting an ocean, sea, or lake. Cases and statutes, however, have used "riparian owner" broadly to describe all waterfront owners. "Accretion" means the gradual and imperceptible accumulation of land along the shore or bank of a body of water. "Reliction" or "dereliction" is an increase of the land by a gradual and imperceptible withdrawal of any body of water. "Avulsion" is the sudden or perceptible loss of or addition to land by the action of the water or a sudden change in the bed of a lake or the course of a stream. "Gradual and imperceptible" means that, although witnesses may periodically perceive changes in the waterfront, they could not observe them occurring. See generally Black's Law Dictionary (5th ed. 1979); F. Maloney, S. Plager & F. Baldwin, Water Law and Administration  The Florida Experience 385-92 (1968); 65 C.J.S.. Navigable Waters §§ 81, 86, 93 (1966). In Philadelphia Co. v. Stimson, 223 U.S. 605, 32 S.Ct. 340, 56 L.Ed. 570 (1912), the United States Supreme Court, in defining this phrase, explained:
[For the change to be perceptible, it] is not enough that the change may be discerned by comparison at two distinct points of time. It must be perceptible when it takes place. "The test as to what is gradual and imperceptible ... is, that though the witnesses may see from time to time that progress has been made, they could not perceive it while the process was going on."
Id. at 624, 32 S.Ct. at 346, quoting County of St. Clair v. Lovingston, 90 U.S. (23 Wall.) 46, 68, 23 L.Ed. 46 (1874) (citations omitted).
This Court has expressly adopted the common law rule that a riparian or littoral owner owns to the line of the ordinary high water mark on navigable waters. State v. Florida Natural Properties, Inc., 338 So.2d 13 (Fla. 1976); Hayes v. Bowman, 91 So.2d 795 (Fla. 1957); Brickell v. Trammell, 77 Fla. 544, 82 So. 221 (1919); Thiesen v. Gulf F. & A. Ry. Co., 75 Fla. 28, 78 So. 491 (1918). We have also held that riparian or littoral rights are legal rights and, for constitutional purposes, the common law rights of riparian and littoral owners constitute property. Hayes; Brickell; Thiesen; Feller v. Eau Gallie Yacht Basin, Inc., 397 So.2d 1155 (5th DCA 1981). Riparian and littoral property rights consist not only of the right to use the water shared by the public, but include the following vested rights: (1) the right of access to the water, including the right to have the property's contact with the water remain intact; (2) the right to use the water for navigational purposes; (3) the right to an unobstructed view of the water; and (4) the right to receive accretions and relictions to the property. See Hughes v. Washington, 389 U.S. 290, 88 S.Ct. 438, 19 L.Ed.2d 530 (1967); County of St. Clair; Hayes; Brickell; Thiesen. In Brickell, we said these riparian or littoral rights are "property rights that may be regulated by law, but may not be taken without just compensation and due process of law," Brickell, 77 Fla. at 561, 82 So. at 227, and we recently reaffirmed that principle in Florida National Properties, Inc.
The common law right of a riparian or littoral owner to accretions or relictions has a significant historical foundation. Blackstone set forth this right:
And as to lands gained from the sea, either by alluvion, by the washing up of sand and earth, so as in time to make terra firma; or by dereliction, as when the sea shrinks back below the usual watermark; in these cases the law is held to be, that if this gain be by little and little, by small and impercetible degrees, it shall go to the owner of the land adjoining... . [T]hese owners being often losers by the breaking in of the sea, or at charges to keep it out, this possible gain is therefore a reciprocal consideration for such possible charge or loss.
*937 2 W. Blackstone, Commentaries [*]261-62 (emphasis in original). In Banks v. Ogden, 69 U.S. (2 Wall.) 57, 67, 17 L.Ed. 818 (1864), the United States Supreme Court recognized accretions and relictions as a vested property right:
Almost all jurists and legislators ... both ancient and modern, have agreed that the owner of the [waterfront property] ... is entitled to these additions. By some the rule has been vindicated on the principle of natural justice, that he who sustains the burden of losses and of repairs, imposed by the contiguity of waters, ought to receive whatever benefits they may bring by accretion; by others it is derived from the principle of public policy, that it is the interest of the community that all land should have an owner, and most convenient, that insensible additions to the shore should follow the title to the shore itself.
Many decisions of this Court have accepted the common law principle that title to additional lands caused by accretions and relictions is vested in owners of abutting waterfront lands. Florida National Properties; Brickell; Thiesen; Merrill-Stevens Co. v. Durkee, 62 Fla. 549, 57 So. 428 (1911); Broward v. Mabry, 58 Fla. 398, 50 So. 826 (1909). See also Ford v. Turner, 142 So.2d 335 (Fla. 2d DCA 1962); Paxson v. Collins, 100 So.2d 672 (Fla. 3d DCA 1958); Mexico Beach Corp. v. St. Joe Paper Co., 97 So.2d 708 (Fla. 1st DCA 1957).

Ownership of Artificial Accretions
We first address the Trustees' contention that the state owns all accretions from artificial causes. It is significant to note that the law, as it has developed, does not distinguish between natural and artificial accretions or relictions when the abutting waterfront owner did not cause the improvements which resulted in the formation of additional land. A recent A.L.R. annotation summarized: "[I]t is also a widely accepted proposition that the fact that such [accumulations] were initiated, accelerated, or otherwise influenced by artificial, manmade structures has no effect on the general rule of accretion and reliction." Annot., 63 A.L.R.3d 249, 255-56 (1975). More than a century ago, the United States Supreme Court addressed this question and stated:
Whether it is the effect of natural or artificial causes makes no difference. The result as to the ownership in either case is the same. The riparian right to future alluvion is a vested right. It is an inherent and essential attribute of the original property. The title to the increment rests in the law of nature. It is the same with that of the owner of a tree to its fruits, and of the owner of flocks and herds to their natural increase. The right is a natural, not a civil one.
County of St. Clair, 90 U.S. (23 Wall.) at 68-69 (emphasis added). More recently, the Supreme Judicial Court of Massachussetts, in addressing the same type of question, in Michaelson v. Silver Beach Improvement Association, 342 Mass. 251, 173 N.E.2d 273 (1961), stated: "The fact that `the building of the breakwaters by public authority may have aided the operation of natural causes in the deposit of the accretions ... does not modify the general rule that the littoral proprietor is entitled to his proportionate share of such accretions.'" Id. 173 N.E.2d at 275 (quoting Burke v. Commonwealth, 283 Mass. 63, 186 N.E. 277, 279 (1933)).
Our Second District Court of Appeal considered title to artificially caused accretions in Board of Trustees of the Internal Improvement Trust Fund v. Medeira Beach Nominee, Inc., 272 So.2d 209 (Fla. 2d DCA 1973). In that case, accretion resulted from offshore wooden groins placed as part of a public beach stabilization program. The court rejected an argument to distinguish between natural and artificial accretions and awarded the accreted property to the upland littoral owner. As the court explained: "Were the state to gain title to this accreted land, we believe that riparian titles around the state would be in jeopardy of unmarketability." Id. at 213. Speaking about this rule, a Florida commentator on water rights states:
The reasoning supporting this rule becomes obvious when the equitable rights *938 of the riparian owner are examined. It would be unjust to allow one to lose his riparian rights merely because a nearby owner erected a groin or dike.
F. Maloney, Water Law and Administration 389.
In the instant case, the trial court expressly found that neither the waterfront owner nor anyone on its behalf constructed the jetty which, together with natural causes, caused the accretion. The law is clear that, under these circumstances, the riparian or littoral owner has a vested right to new lands formed as a result of the accretion or reliction. The fact that such accretions or relictions occurred in part because of artificial improvements does not affect the owner's title to those lands provided the owner has not constructed the improvements which caused the accretions.
We note, however, that the common law has never allowed a waterfront owner to receive title to artifically created accretions when he caused those additions to his land by improvements. In this circumstance, title to the accreted land remains with the sovereign. The district court in Medeira Beach explains: "[S]ince land below the ordinary high water mark is sovereignty land of the state, to permit the riparian owner to cause accretion himself would be tantamount to allowing him to take state land." 272 So.2d at 212. In that case, before determining the waterfront owner was entitled to the accreted land, the district court noted that the owner was not responsible for the placement of wooden groins which caused the accretions.

Right to Artificial Accretions under Section 161.051, Florida Statutes (1981)

The Trustees' second contention is that, even if the law prior to 1961 awarded waterfront owners title to artificial accretions, the enactment of section 161.051 modified that rule of law to direct that all artificially-caused accretions belong to the state. Before construing this statute, we should first review legislation regarding waterfront owners' rights.
In 1856, the Florida Legislature expanded waterfront owners' rights by modifying the common law rule concerning artificial additions to waterfront property in the enactment of the Butler Act. Ch. 791, Laws of Fla. (1856). This "Act to benefit Commerce" provided that the State of Florida, in consideration of this benefit, would divest itself of all right, title, and interest to lands covered by water lying in front of land of a citizen vesting title in riparian proprietor owners and "giving them the full right and privilege to build wharves into streams or waters of the Bay or Harbor as far as may be necessary ... and to fill up from the shore, bank or beach, as far as may be desired, not obstructing the channel." In 1921, this Act was amended to specify that this grant of title did not affect submerged lands "until actually filled in or permanently improved." See ch. 8537, Laws of Fla. (1921). In 1957, this public policy was changed because of concern for the rights of the public in submerged sovereignty lands and these additional statutory riparian and littoral rights were repealed. See ch. 57-362, Laws of Fla. Section 161.051 was enacted in 1965 as part of the chapter entitled "Beach, Shore and Preservation Act," and has as its intent the regulation of construction, reconstruction, and other physical improvements on waterfront properties.
The Trustees contend that section 161.051 does not distinguish between owners who caused the accretions through artificial means and owners who benefited from artificial accretions but had no control over the improvements. Section 161.051 provides:
161.051 Coastal construction by persons, firms, corporations, or local authorities.  Where any person, firm, corporation, county, municipality, township, special district, or any public agency shall construct and install projects when permits have been properly issued, such works and improvements shall be the property of said person, firm, corporation, county, municipality, township, special district, or any public agency where located, and shall thereafter be maintained by and at the expense of said person, firm, corporation, county, municipality, township, special district, or other *939 public agency. No grant under this section shall affect title of the state to any lands below the mean high-water mark, and any additions or accretions to the upland caused by erection of such works or improvement shall remain the property of the state if not previously conveyed. The state shall in no way be liable for any damages as a result of erections of such works and improvements, or for any damages arising out of construction, reconstruction, maintenance, or repair thereof, or otherwise arising on account of such works or improvements.
According to the Trustees, the second sentence of the Act was intended to apply to accretions of property owners who had no control over the improvement.
We find the district court's construction of the statute correct and reject the Trustees' contention that the legislature intended to usurp vested rights from unsuspecting waterfront owners. We find the statute is intended to apply only to persons or entities seeking to construct coastal improvements, and, by its terms, sets forth the following four objectives. First, when the state approves construction on submerged sovereignty land, the builder owns the improvements and must maintain them. Second, a permit granted to build improvements on submerged sovereignty land does not convey the underlying sovereignty land. Third, any additions or accretions to the land of the permittee that are caused by the improvement do not add to the permittee's lands. Fourth, the state is not liable for any damages resulting from the improvements constructed on its sovereignty lands by the permittee.
The Trustees construe the second sentence out of context to the statute as a whole. The second sentence was intended to apply only to the permittee's "additions or accretions to the upland" that were caused by permitted improvements. While the statute allows the construction of improvements on submerged lands, it was intended to make clear that the original common law would apply to accretions artificially caused by the land owner, and that title to those accumulations would remain in the state.
In our view, section 161.051 was intended to codify common law principles and was not intended to deprive unsuspecting waterfront owners of their rights to accretion and reliction caused by artificial improvements for which they were not responsible. Along Florida's waterfront, state and local governments permit construction of many jetties, groins, docks, seawalls, and other improvements which result in accretions to both public and private lands. To accept the Trustees' view would lead to the unjust result that improvements authorized by the state for one waterfront owner, which cause accretions to another waterfront owner, would divest from the second unsuspecting owner his vested riparian or littoral rights. Without question, the Trustees' interpretation would have a disastrous effect on many unsuspecting waterfront owners and would necessitate a finding that this is a taking by the state of vested riparian and littoral rights without compensation.

The Application of Martin v. Busch

The Trustees' final contention is that Martin v. Busch controls this case. They assert that Martin holds that the upland owner takes title to bottom land uncovered by reliction only when the reliction is due to natural causes, not when land is reclaimed by artificial means through government drainage operations, and that Justice Brown's concurring opinion, in referring to the riparian rights doctrine of accretion and reliction, supports their contention that upland owners have no right to artifically caused accretion. The Trustees' reliance on Martin is clearly misplaced because the property owner in that case did not claim title on the basis of riparian rights to accretions and relictions. Martin's sole issue was a boundary dispute, and the parties were arguing over which survey should be used to identify the ordinary high water mark. We held that
the conveyance ... covered only an estimated acreage of unsurveyed swamp and overflow lands
and
the swamp and overflowed lands covered by the conveyance from the State Trustees *940 did not extend below ordinary high water mark of the navigable lake,
and
the averments of the answer cannot vary the terms of the conveyance by the State Trustees and cannot affect the legal status of the sovereignty lands that were not included and could not lawfully be included in or covered by the conveyance of swamp and overflowed lands made by the State Trustees to complainant's predecessor in title.
93 Fla. at 575-76, 112 So. at 287.
The portion of the opinion relied on by the Trustees relates to a general statement concerning water rights, rather than the holding in the case. To understand that portion of Martin taken out of context by the Trustees, it is necessary to quote portions preceding and subsequent to the relied-upon language:
The subsequent vesting of title to sovereignty lands in the Trustees for State purposes under the Acts of 1919 or other statutes, does not make the title to sovereignty land inure to claimants under a previous conveyance of swamp and overflowed lands by the State Trustees who then had no authority to convey such sovereignty lands and did not attempt or intend to convey sovereignty lands.
A riparian owner is one who owns to the line of ordinary high water mark on navigable waters.
Riparian owners in this State usually have title to ordinary high water mark of navigable waters; the lands below such mark belong to the State by virtue of its sovereignty, and are not held for ordinary private ownership purposes.
If to serve a public purpose the State, with the consent of the Federal authority, lowers the level of navigable waters so as to make the water recede and uncover lands below the original high water mark, the lands so uncovered below such high water mark, continue to belong to the State. Reliction is the term applied to land that has been covered by water, but which has become uncovered by the imperceptible recession of the water.

The doctrine of reliction is applicable where from natural causes water recedes by imperceptible degrees, and does not apply where land is reclaimed by governmental agencies as by drainage operations. 29 Cyc. 354 see Baumhart v. McClure, [21] Ohio [App.] [491], 153 N.E.Rep. 211.
The Riparian Acts of 1856 and 1921 apply only to "any navigable stream, bay or the sea or harbor." The latter statute by express provision does not "apply to lakes, except tide water lakes," and Lake Okeechobee is not a tide water lake. Sec. 6, Chapter 8537.
Chapter 7892, Acts of 1919, validated all land surveys approved by the Chief Drainage Engineer for the Trustees of the Internal Improvement Fund, and does not validate any other surveys. The authority given by the Trustees to survey the line of high water mark of the navigable lake and the survey made must be held to mean ordinary high water mark in the absence of a contrary showing.
93 Fla. at 573-74, 112 So. at 287 (emphasis added).
This part of the opinion sets forth general water law principles. The underlined portion of the opinion explains that the state, for a public purpose, may lower the level of navigable waters by drainage without losing title to the uncovered sovereignty lands. It then defines reliction as occurring by the imperceptible recession of the water and concludes that reclamation by a drainage operation is not reliction by "imperceptible degrees." The case cited, Baumhart v. McClure, explains the distinction between upland property that disappears under the water suddenly and property that disappears slowly and gradually and then reappears. It also states that a party claiming accreted land has the burden of establishing that an accumulation actually occurred slowly and imperceptibly.
We reject the Trustees' contention that the dicta in Martin means that riparian owners are divested, not only of their riparian or littoral right to accretions, but also *941 of their property's waterfront characteristics. This Court expresses no such intent in Martin v. Busch, and, in fact, the concurring opinion of Justice Brown states that Martin does not involve the rights to accretion and reliction. We conclude that Martin v. Busch does not establish any basis for the state to claim title to accretions not caused by the upland riparian or littoral owner. Our subsequent decisions show there was no intent to change common law principles regarding the right to accretions and relictions. See, e.g., Forman v. Florida Land Holding Corp., 121 So.2d 784 (Fla. 1960).

Conclusion
The trial court found that the subject additional lands resulted from "accretion" and occurred "gradually and imperceptibly." We hold that the upland waterfront owner, Sand Key, is entitled to the accretion because it did not participate in the improvements which, together with natural causes, resulted in the accretion. Our holding does not change the existing law or interfere with the state's basic responsibility to hold submerged sovereignty lands in trust for its people. Further, our holding recognizes the principle that waterfront owners cannot claim title to accretions which they have caused.
For the reasons expressed, we approve the district court decision and its construction of section 161.051, Florida Statutes.
It is so ordered.
SHAW and BARKETT, JJ., and ADKINS, J. (Retired), concur.
EHRLICH, J., dissents with an opinion, in which McDONALD, C.J., concurs.
EHRLICH, Justice, dissenting.
I dissent. The majority disregards or misunderstands some crucial points established by over half a century of Florida case law, misconstrues the plain language of section 161.051 and grossly misinterprets Martin v. Busch, 93 Fla. 535, 112 So. 274 (1927).
I agree with the majority that the issue before us is a narrow one, but, unfortunately, what the issue is has been misstated by the majority. Perhaps the majority's confusion is attributable to the district court's phrasing of the certified question which is factually inapposite to the case before us. The jetty which has caused the accretion at issue here was constructed by the state. It is the legal consequences of the state's action which should be the focus of our inquiry. Therefore, the proper framing of the certified question should be:
When a public entity erects a structure which causes sovereignty lands to become exposed by the process of accretion is the state entitled to the accreted lands of all upland littoral owners?[1]
The answer to this question is affirmative: the state does not lose title to any of its sovereignty lands under these narrow circumstances. This answer was set forth in Martin v. Busch and is clearly what was intended by the legislature when enacting section 161.051.
The majority cites, apparently as persuasive authority, to the discussion of certain common law principles by the United States Supreme Court in County of St. Clair v. Lovingston, 90 U.S. (23 Wall.) 46, 23 L.Ed. 59 (1874). What the majority fails to appreciate, however, is that the question of which rules of substantive property law apply to each state's sovereign lands is a question for each state to decide. Id. at 68.[2] Discussing the rules of law the different *942 states apply to sovereign land questions, the United States Supreme Court in Shively v. Bowlby, 152 U.S. 1, 14 S.Ct. 548, 38 L.Ed. 331 (1894), explained:
The foregoing summary of the laws of the original States shows that there is no universal and uniform law upon the subject; but that each State has dealt with the lands under the tidewaters within its borders according to its own views of justice and policy, preserving its own control over such lands, or granting rights therein to individuals or corporations, whether owners of the adjoining upland or not as it considered for the best interests of the public. Great caution, therefore, is necessary in applying precedents in one State to cases arising in another.
Id. at 26, 14 S.Ct. at 557. The principle that state substantive property law applies to questions involving sovereignty lands was recently reaffirmed by the United States Supreme Court in Oregon ex rel. State Land Board v. Corvallis, 429 U.S. 363, 97 S.Ct. 582, 50 L.Ed.2d 550 (1977).
The majority discusses common law principles which are irrelevant to the case before us. The issue presented under the facts of this case is what is Florida's common law rule concerning title to accreted alluvial deposits when those deposits are caused by the state? This question is answered by our decision in Martin v. Busch, 93 Fla. 535, 112 So. 274 (1927), a case which the majority seemingly does not understand. The majority's statement that Martin's sole issue was a boundary dispute is correct. That is the "sole" issue here as well: Where is the boundary between public and private ownership of these accreted lands? What is blatantly incorrect are the majority's unsupportable assertions that first, the parties were arguing over which survey should be used to identify the ordinary high water mark, and second that Justice Whitfield's discussion of riparian rights and the doctrine of reliction were simply general statements concerning water rights and were dicta.[3] It is the majority, not the petitioners, who takes the controlling statement of law from Martin out of context and refuses to recognize its significance.
The plaintiffs in Martin brought a quiet title suit against the Trustees of the Internal Improvement Fund. The plaintiffs' predecessor in title, Henderson, had received a grant of 98,276.83 acres of land from the trustees. These lands had become property of the state by "Everglades Patent # 137" from Congress to the State of Florida pursuant to the (swamp land grant) act of September 28, 1850. Patent # 137, and in turn the deed from the trustees to Henderson, # 15898, contained language that the land so granted was bounded by Lake Okeechobee. 93 Fla. at 546, 112 So. at 278. The parcels of land in dispute were the fractional sections 11 and 12. A full section of land contained 640 acres, but sections 11 and 12 contained less than this amount because they bordered the lake. Id. at 558, 112 So. at 281. All the lands deeded to Henderson in 1904 were unsurveyed by the state, but an official survey was contemplated. At the time of the trustees' deed there was a private survey, the Keller survey, which was utilized by the parties to roughly determine where the ordinary high water mark of the lake was and thus the boundaries of fractional sections 11 and 12. Id. at 575, 112 So. at 287.
The question concerning the boundaries of sections 11 and 12 presented in Martin required consideration of the legal consequences of two events. First, the state had begun drainage operations in Lake Okeechobee in 1911 which lowered the water level of the lake, leaving exposed formerly submerged sovereignty lands. Second, an *943 official state survey was completed in 1918, which was virtually identical to the Keller survey, and which established the official high water mark of the lake. The line so established was the ordinary high water mark at the time of the conveyance from the trustees to Henderson, and not the "new" mark which resulted from the state drainage operations: "The land in controversy is ... between the meander line of the navigable lake surveyed under State authority after the conveyance by trustees in 1904, and the waters of the lake at the time the suit was brought." Id. at 558, 112 So. at 281-282.
The complaint against the trustees alleged only that the deed from the trustees to Henderson did encompass the land in controversy and that although the trustees claim some right in this land, the plaintiffs did not know the nature of the claim, but "whatever the basis of said claim, the same is without foundation in law." Id. at 543, 112 So. at 277. The trustees answered, tracing the chain of the title from Federal Patent # 137 to Deed # 15898 to Henderson, that fractional sections 11 and 12 when deeded bordered the lake, that at the time of the deed the land at issue was submerged sovereignty lands, that since the time of the deed the state had caused the waters of the lake to recede thus exposing the formerly submerged sovereignty land and title to this land was thus vested in the trustees pursuant to Chapter 7861 and 7891, Laws of Florida (1919). Id. at 546, 112 So. at 278. The trustees further explained that the Keller survey had been relied upon by the trustees and Henderson at the time of the deed and that the deed to Henderson conveyed land only to the high water mark as it existed in 1904. The trustees alleged, and this court so held, that although the Keller survey was not an official survey it was approximately correct and that the grantees of the trustees had received all the land due them with or without reference to the Keller survey. Id. at 576-577, 112 So. at 288.[4] The primary thrust of the plaintiff's argument was that the Keller survey had used the lake as the boundary, and since the locus in quo was land at the time the suit to quiet title was brought, the presumption was that it had always been land. Briefs for appellees at page 4. Also of significance is the plaintiff's position that the fact that after the Henderson grant the lake had been drained showed that the land in question had been swamp and overflow land, that it always was land and never lake: "Upon what hypothesis within the realm of commonsense and reason can be presumed ... that the land was ever a part of the bottom of a navigable lake is beyond our comprehension." Brief of appellees at p. 9.
It was not, however, beyond Justice Whitfield's comprehension. Writing the opinion for the Court, Justice Whitfield proceeded to discuss each relevant theory which would settle the question of who owned title to the land in controversy. He explained that title to all lands beneath navigable waters vested in the state at the moment of statehood and remained vested in the state unless lawfully conveyed; since such private ownership is exceptional, it must be specifically shown. He then went on to explain that both the federal patent to the state and the trustees' deed to Henderson had referred to the shores of the lake, and held that such a conveyance of swamp and overflow lands carried title only to the ordinary high water mark of the lake. 93 Fla. at 566, 112 So. at 284. In Martin, however, these two holdings did not dispose of the title question because of the fact that the state drainage operations had lowered the level of the lake and the state survey, made subsequent to the Henderson grant, had established the high water mark at its former level. The question before the court then was, what other theories could have availed the plaintiffs? There were several, and the court specifically addressed each one, several of which are pertinent here. The land at issue was alleged to have been included in the town of Moore Haven, platted and promoted by *944 the plaintiffs and their predecessors. Therefore, the question logically arose, could the plaintiffs claim title under a theory of adverse possession? The court's response was no:
Even if before the official meander line was run in 1917-1918 the complainants assumed to exercise ownership rights in the land that had been below high water mark and on the lake side of the meander line as subsequently run, such exercise of asserted ownership rights does not give complaintants any right or title to sovereignty lands that were actually below high water mark of the navigable lake.
Id. at 567, 112 So. at 284.
The trustees had no lawful authority to dispose of sovereignty lands when the grant to Henderson was made. Could the fact that the trustees later acquired such authority be used to quiet title in the plaintiffs under an estoppel by deed theory? Again the court's response was no:
The authority given such Trustees by Chapter 7861, 7891, Acts of 1919, with reference to submerged and marsh lands was subsequent to the conveyance of unsurveyed swamp and overflowed lands by the State Trustees to complainants' predecessors in title in 1904; and any authority that may be conferred by the Acts of 1919, does not operate to convey or confirm title to lands not covered by the conveyance in 1904.
Id. at 571, 112 So. at 286.
What other possible theory remained which could have quieted title in the plaintiffs under these facts? The answer, of course, is the doctrine of reliction. Under this doctrine, title to formerly submerged sovereignty lands exposed by the slow and imperceptible recession of the water vests in the riparian owner. Would this doctrine apply in Florida when the cause of the water's recession was a deliberate drainage operation undertaken by the state? Again, the court's answer was clearly no:
A riparian owner is one who owns to the line of ordinary high water mark on navigable waters.
Riparian owners in this State usually have title to ordinary high water mark of navigable waters; the lands below such mark belong to the State by virtue of its sovereignty, and are not held for ordinary private ownership purposes.
If to serve a public purpose the State, with the consent of the Federal authority, lowers the level of navigable waters so as to make the water recede and uncover lands below the original high water mark, the lands so uncovered below such high water mark continue to belong to the State. Reliction is the term applied to land that has been covered by water, but which has become uncovered by the imperceptible recession of the water.
The doctrine of reliction is applicable where from natural causes water recedes by imperceptible degrees, and does not apply where land is reclaimed by governmental agencies as by drainage operations.

Id. at 574, 112 So.2d at 287. (emphasis supplied).
What was the final result reached in Martin v. Busch? In the deed from the trustees to the private landowners, the owners had taken land only up to the ordinary high water mark as it existed at the time of the deed. There is absolutely no question that the owners were riparian owners; the trustees' deed conveyed land only up to the high water mark of Lake Okeechobee and no more. The fact that the state had subsequently caused the water to recede thus exposing formerly submerged lands  the land at issue in the case  had significance to the court for two separate reasons. First, the plaintiffs utilizing these lands in the promotion of the town of Moore Haven, could not quiet title in the plaintiffs under a theory of adverse possession. Second, and critical for the issue at hand, the "riparian rights doctrine" of reliction, which would ordinarily vest title to the former sovereignty lands in the riparian owner, would not apply when the state caused the water to recede. What was the impact of this holding on the owners in Martin v. Busch? Their land lost its "waterfront characteristics" to the limited extent that the owners held title up *945 to the ordinary high water mark as it existed in 1904. The land at issue, which was between this line and the water line as it existed in 1927, continued to belong to the state.
The majority's tragic confusion over the significance of Martin v. Busch is reflected in two of its erroneous conclusions concerning the case. First, is its misunderstanding of Justice Brown's concurring opinion. Initially, I point out the obvious: A concurring opinion does not represent the holding of the court. Even so, Justice Brown concurs with the court's holding and a simple reading of his opinion clearly shows that the private landowner was a "riparian owner" owning title to the high water mark as it existed at the time of the deed; the riparian rights doctrine of reliction would not under these facts vest title in the private owner:
The deed to the Hendersons must be construed as carrying title up to such ordinary high water mark. .. . The fact that these lands were, subsequent to the Henderson deed, uncovered and reclaimed by the lowering of the lake level by artificial drainage conducted by the State could not change the title to such lands, which remained in the State just as it was when covered by the lake. The riparian rights doctrine of accretion and reliction does not apply to such lands.
Id. at 577-578, 112 So. at 288.
The second erroneous conclusion is the majority's claim that reclamation by a drainage operation is not reliction by "imperceptible degrees," at 940-41. It would fly in the face of known physical laws and plain common sense to presume that a deliberate drainage operation in an enormous fresh water lake such as Lake Okeechobee was anything other than slow and imperceptible. The majority's confusion apparently lies in its failure to understand the difference between the physical process of reliction and the legal doctrine of reliction. Relicition is a physical fact: It is the slow and imperceptible recession of the water which leaves exposed formerly submerged lands. The doctrine of reliction deals with the legal consequences which flow from the physical process. Under the doctrine of reliction, when water slowly and imperceptibly recedes from the shoreline and thus leaves exposed formerly submerged lands, title to this "new" land so exposed by the physical process of reliction vests in the upland riparian owner.[5] Again, the relevant holding from Martin v. Busch was as follows:
The doctrine of reliction is applicable where from natural causes water recedes by imperceptible degrees, and does not apply where land is reclaimed by governmental agencies as by drainage operations.
93 Fla. at 574, 112 So. at 287 (emphasis supplied).
The correct understanding of this holding is, of course, that when the physical cause of the reliction is the state, as opposed to natural causes, the doctrine of reliction will not apply: Title to the land so exposed will remain in the state and will not vest in the riparian owner as it would have had the physical cause of the reliction been natural forces. With a sole aberrant exception,[6] this view of Martin v. Busch *946 has been universally accepted by Florida courts and commentators since it was decided. See, e.g., Florida National Properties; State v. Contemporary Land Sales, Inc., 400 So.2d 488 (Fla. 5th DCA 1981); Board of Trustees of the Internal Improvement Trust Fund v. Medeira Beach Nominee, Inc., 272 So.2d 209 (Fla. 2d DCA 1973); Padgett v. Central and Southern Florida Flood Control District, 178 So.2d 900 (Fla. 2d DCA 1965); Conoley v. Naetzker, 137 So.2d 6 (Fla. 2d DCA 1962). See also 42 Fla.Jur.2d Public Lands § 111 (1983). This particular holding from Martin v. Busch has been accepted by the district courts and was recently reaffirmed by this Court in State v. Florida National Properties, Inc., 338 So.2d 13 (Fla. 1976), wherein we held:
[W]e recognize that the doctrine of relicition is applicable in situations where water recedes by imperceptible degrees from natural causes and that it does not apply where land is reclaimed by deliberate drainage.

Id. at 18 (emphasis supplied, footnote omitted). Further, the seminal importance of Martin v. Busch in this area of Florida's jurisprudence is reflected in this Court's recent opinion of Coastal Petroleum Co. v. American Cyanamid Co., 492 So.2d 339, 342-343 (Fla. 1986).
Thus, it unequivocally appears that this rule of Martin v. Busch is clearly in conflict with the majority's treatment of this case. If to serve a public purpose the state through drainage operations causes water to recede, thus exposing sovereign lands, and title remains in the state, then when the state to serve a public purpose causes sovereign lands to become accreted by construction of a jetty, title to these lands, too, should remain in the state. Because this issue is critical for resolution of this case, it is my view that we should either adhere to this point of Martin v. Busch or else expressly overrule it, but certainly not misstate the factual underpinnings of the case which the majority opinion blatantly does. It is my opinion that Martin v. Busch has served us well and should be reaffirmed.[7]
It is with this background understanding of the common law as stated in Martin v. Busch that the statute at issue here must be assessed. One of the reasons supporting the rule that a private riparian or littoral owner cannot claim title to accretions which the owner himself has caused, is that the lands so accreted were sovereignty lands and to allow the owner to claim title would be tantamount to allowing him to take sovereignty lands. See, e.g., Board of Trustees of the Internal Improvement Trust Fund v. Medeira Beach Nominee, Inc., 272 So.2d at 212.[8] This same reasoning provides the underpinning for the rule of Martin v. Busch. When the state attempts to provide a public benefit, title to the sovereignty lands exposed in the process continue to belong to the state. Any other holding would lead to the absurd result that a state sponsored and approved project, undertaken to create a public benefit, would divest the state of its sovereignty lands and grant a private landowner a windfall at the expense of the public.
It is exactly this absurd result which the majority embraces. I agree with the majority that, in part, section 161.051 codifies existing common law principles. The applicable common law principle, however, is *947 the rule from Martin v. Busch that under these narrow circumstances the state does not lose title to its sovereignty lands. The majority's construction of section 161.051 is that only the owner on whose property the improvement is located is deprived of the accreted land. To reach the result it desires, the majority adds language to the statute which is clearly not there and which is contrary to both Florida's common law rule of Martin v. Busch and the legislative intent in enacting section 161.051. The majority, at 940-41, reads into the act that any accretions caused by the improvement do not add to the "permittee's" land and that the statutory requirement that any accretions continue to belong to the state applies only to the permittee's land. This interpretation focuses on one tangentially related rule of common law, which is not relevant to the facts of this case, and totally ignores the controlling common law rule established by Martin v. Busch. It is my view that Martin v. Busch stands for the proposition that a private owner does not have a vested right to claim title to sovereign lands when these lands are exposed by actions of the state. Far from being meritless as characterized by the majority, the construction of the statute urged by the petitioners sub judice fully comports with Florida's common law. It is the majority which here today abrogates that law.
The statute at issue here is unequivocally intended to preserve and protect Florida's beaches; indeed the statute's title, The Beach and Shore Preservation Act, could not be clearer as to its intended purpose. The majority refers throughout its opinion to the "unsuspecting landowner." I suggest that it is more accurate in light of the majority opinion to speak of the unsuspecting public who, having paid for an improvement intended to preserve public beaches, will now be deemed to have granted away its ownership rights by its efforts. Such a result is clearly contrary to the statute: section 161.051 explicitly provides that any accretion caused by the improvement shall remain the property of the state.
Further, it is my view that the correct interpretation of the statute would only marginally interfere with private rights. The right of ingress and egress over the private property to the water will not be altered, nor will the right to an unobstructed view of the water be infringed. The effect of the statute only sets the boundary between the private and public lands where it existed prior to the accretions at issue were caused by the state. This is the common law in Florida, Martin v. Busch, and is what the statute intends. Can it be doubted that without this improvement the respondents here might have lost a significant portion of their property through erosion, a prospect which the statute attempts to prevent? I would therefore suggest that if, instead of following the law, we are weighing considerations of "fairness" as the majority intimates, all members of the public, including the respondents, benefit under the statute and under these narrow circumstances the public's interest in its sovereignty lands should prevail. See Art. X, § 11, Fla. Const.
By failing to recognize the true issue and failing to address the controlling principle of Florida law, the majority opinion does not hold water and rests on shakier ground than the stretch of Florida beach at issue here.
The Court, by its opinion, has blatantly rewritten the section of the statute by limiting its operation to "permittees," and by so doing is giving away lands which are held by the state by virtue of its sovereignty, in trust for all the people. The legislature may authorize the sale of such lands, but "only when in the public interest," or may authorize private use of portions of such lands, "but only when not contrary to the public interest." Art. X, § 11, Fla. Const. The giving away of such lands is not only not authorized by our Constitution, it is wrong, wrong, wrong.
I would answer the certified question, as reframed, in the affirmative, quash the decision of the district court of appeal and remand for reinstatement of the judgment entered by the trial court.
McDONALD, C.J., concurs.
NOTES
[1] Alluvion is the actual earth which is deposited on a shore by the force of the water, as by current or by waves. Accretion is the process whereby alluvion is gradually and imperceptibly added to the shore. Reliction is the process whereby the water recedes gradually and imperceptibly from the shore, thereby leaving formerly submerged lands exposed. Accretion and reliction are discussed together as, for title and boundary purposes, the legal consequences are identical. See generally F. Maloney, Florida Water Law 1980, 726, 727 (hereinafter cited as Maloney).
[2] It also appears that the Supreme Court's discussion of these common law rules was based on the fact that Illinois, the state in question in Lovingston, followed these rules. See Oregon ex rel. State Land Board v. Corvallis Sand and Gravel Co., 429 U.S. 363, 380 n. 8, 97 S.Ct. 582, 592 n. 8, 50 L.Ed.2d 550 (1977).
[3] I point out that Justice Whitfield authored the seminal decisions in this area of our jurisprudence. See, e.g., Apalachicola Land and Development Co. v. McRae, 86 Fla. 393, 98 So. 505 (1923); Brickell v. Trammell, 77 Fla. 544, 82 So. 221 (1919); Merrill-Stevens Co. v. Durkee, 62 Fla. 549, 57 So. 428 (1911); Clement v. Watson, 63 Fla. 109, 58 So. 25 (1912); Broward v. Mabry, 58 Fla. 398, 50 So. 826 (1909); Ferry Pass, Inspectors' & Shippers' Ass'n v. White's River Inspectors' & Shippers' Ass'n, 57 Fla. 399, 48 So. 643 (1909) and State ex rel. Ellis v. Gerbing, 56 Fla. 603, 47 So. 353 (1908).
[4] The only other survey mentioned in the case was a Frederick survey, and a reexamination of the briefs filed by the appellees in Martin reveals no mention of, much less reliance on, this survey.
[5] Of identical legal effect is the doctrine of accretion. As previously stated, the physical process of accretion is characterized by the slow and imperceptible addition of soil (alluvion) to the shore. Under the doctrine of accretion, title to this "new" land vests in the upland riparian owner. Although the physical process of accretion differs from the process of reliction, the legal doctrines are discussed together in Florida and every other jurisdiction because the legal consequences are the same.
[6] In Bryant v. Peppe, 238 So.2d 836, (Fla. 1970), the court in dicta mischaracterized the Martin v. Busch drainage as avulsion. Avulsion is the sudden or violent action of the elements causing, for example, a channel of a river to abandon its old bed for a new one, or the removal of a substantial quantity of earth from the land of one owner and its subsequent deposit on that of another. The difference between avulsion and reliction or accretion is that avulsion is perceptible while in progress. When "new" land is formed by the process by avulsion, title remains in its former owner. See, e.g., Municipal Liquidators, Inc. v. Tench, 153 So.2d 728 (Fla.2d DCA), cert. denied, 157 So.2d 817 (Fla. 1963); Siesta Properties, Inc. v. Hart, 122 So.2d 218 (Fla. 2d DCA 1960). The change in Bryant v. Peppe was clearly evulsive as a hurricane had caused a sudden emergence of once submerged land. 238 So.2d at 837. Equally as clear is that the deliberate drainage of Lake Okeechobee in Martin was not avulsive.
[7] Admittedly, this principle from Martin v. Busch is a minority view, but there is no dishonor in Florida maintaining a minority position so long as that position serves us well. See, e.g., State v. Neil, 457 So.2d 481 (Fla. 1984) (prohibiting exercise of peremptory challenges on solely racial grounds); Petition of Post-Newsweek Stations, Fla., Inc., 370 So.2d 764 (Fla. 1979) (allowing electronic media coverage of courtroom proceedings).
[8] The district court in Medeira Beach stated in dicta that the Martin v. Busch holding concerning reliction would not be followed in a case involving accretion. This is ipse dixit and had this statement not been dicta, it would have represented the district court attempting to overrule controlling precedent from this Court. See, Hoffman v. Jones, 280 So.2d 431 (Fla. 1973) (correct procedure is for the district court to follow the case law and to certify the question to this Court to be of great public importance). Sub judice, the district court relied on its own decision in Medeira Beach and completely ignored Martin v. Busch.